**MONTGOMERY COUNTY DEPARTMENT OF HUMAN RESOURCES**

v.

**A.S.N. and J.E.C.**

**2140891.**

Court of Civil Appeals of Alabama.

April 15, 2016.

Sharon E. Ficquette, chief legal counsel, and Karen P. Phillips, asst. atty. gen., Department of Human Resources, for appellant.

Juliana Taylor, Montgomery, for appellee A.S.N.

Joshua B. James, Montgomery, for appellee J.E.C.

THOMAS, Judge.

In July 2011, the Montgomery County Department of Human Resources ("DHR") obtained custody of T.C., J.N., and A.C. (hereinafter referred to collectively as "the children") after T.C., who was two weeks old at that time, was admitted to Children's Hospital of Alabama ("Children's Hospital") for treatment for a skull fracture and an oblique fracture of the his left femur.[1]  A.S.N. ("the mother") reported that she had left T.C. in the middle of the bed while she went to the bathroom; she surmised that T.C. might have been injured when J.N., who was then two years old, jumped on the bed.  J.E.C.[2] ("the father") was not in the home when the injuries occurred.  Although T.C. was injured on a Wednesday, the mother did not take T.C. to see a physician until Friday because, she reported, she lacked transportation.  DHR conducted a child-abuse-and-neglect ("CA/N") investigation, which resulted in a finding of "indicated" against the parents for inadequate supervision.  *See* Ala.Code 1975, § 26–14–8(a)(1).  The children were found dependent in October 2011.

On October 28, 2012, DHR filed petitions in the Montgomery Juvenile Court ("the juvenile court") to terminate the parental rights of the parents to the children.[3]  DHR amended those petitions to

1. Contrary to the testimony at trial and statements in DHR's brief on appeal, T.C.'s medical records do not show that he was treated for a spiral fracture of his left femur.  Instead, the X-ray reports and medical records indicate that T.C. had an oblique fracture.  A "spiral fracture" is defined as a fracture that is "helical in the bone" and one that "usually results from a twisting injury," *Stedman's Medical Dictionary* 713 (27th ed.2000), while an "oblique fracture" is one that "runs obliquely to the longitudinal axis of the bone." *Id.* at 712.

2. J.E.C.'s paternity was never adjudicated.  Although DHR arranged paternity testing on more than one occasion, J.E.C. never submitted to a paternity test.  However, the record reflects that all parties agreed that J.E.C. is the father of the children.  Accordingly, for purposes of this opinion, we refer to J.E.C. as the father of the children.  None of the parties has argued on appeal that the lack of an adjudication of J.E.C.'s paternity deprived the juvenile court of jurisdiction to consider the termination-of-parental-rights petitions, and, therefore, we do not consider the question.

3. The petition involving A.C. was assigned case number JU–11–550.02, the petition involving J.N. was assigned case number JU–11–549.02, and the petition involving T.C. was assigned case number JU–11–548.02.

assert abandonment as a ground for termination of the father's parental rights in June 2014. For reasons unclear from the record, the termination-of-parental-rights trial was not held until February 5, 2015, over two years after the petitions were initially filed.[4] After the trial, at which the parents failed to appear, the juvenile court entered an identical judgment in each case on July 9, 2015.[5] In those judgments, the juvenile court declined to terminate the parental rights of the parents.

DHR timely appealed. On appeal, DHR seeks our review of whether the juvenile court's judgments declining to terminate the parents' parental rights are plainly and palpably wrong or unsupported by the evidence. After careful consideration of the entire record, we reverse the judgments and remand the cause with instructions to the juvenile court to enter judgments terminating the parental rights of both the mother and the father to the children.

"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. *Ex parte Beasley*, 564 So.2d 950, 954 (Ala.1990)."

*B.M. v. State*, 895 So.2d 319, 331 (Ala.Civ. App.2004). A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. *Bowman v. State Dep't of Human Res.*,

534 So.2d 304, 305 (Ala.Civ.App.1988). "Clear and convincing evidence" is " '[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.' " *L.M. v. D.D.F.*, 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala. Code 1975, § 6–11–20(b)(4)). "[A juvenile] court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong." *Ex parte State Dep't of Human Res.*, 624 So.2d 589, 593 (Ala.1993). Put another way, "the [juvenile] court's determination on these matters is presumed correct on appeal, and we will not reverse absent a determination that the judgment of the [juvenile] court is so unsupported by the evidence as to be plainly and palpably wrong." *H.M.W. v. Mobile Cty. Dep't of Human Res.*, 631 So.2d 1049, 1050 (Ala.Civ.App.1993).

The termination of parental rights is governed by Ala.Code 1975, § 12–15–319. That statute reads, in part:

"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care

---

**4.** We note that Ala.Code 1975, § 12–15–320(a), requires that "[t]he trial on the petition for termination of parental rights shall be completed within 90 days after service of process has been perfected."

**5.** The juvenile court did not comply with § 12–15–320(a), which requires that a judgment in a termination-of-parental-rights action be entered within 30 days of the completion of trial. DHR twice requested the juvenile court to enter its judgments; only after DHR filed a petition for the writ of mandamus in this court in June 2015, and after this court ordered that the juvenile court answer that petition, did the juvenile court render and enter its judgments.

for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.

"(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.

" . . . .

"(6) Unexplained serious physical injury to the child under those circumstances as would indicate that the injuries resulted from the intentional conduct or willful neglect of the parent.

"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.

" . . . .

"(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.

"(11) Failure by the parents to maintain consistent contact or communication with the child.

"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."

DHR presented the testimony of three witnesses at the trial: LaToya Harrell, the DHR caseworker assigned to the family; S.C., the foster parent of T.C.; and A.M.L., the former foster parent of J.N. and A.C. The testimony of A.M.L. and S.C. was brief. A.M.L. testified that she desired to again serve as a foster or adoptive parent to J.N. and A.C.; she said that J.N. had developed some behavioral problems, which, she said, had been addressed with medication and therapy. S.C. testified that T.C. required special care for autoimmune neutropenia and that he had frequent medical appointments to address his injuries and his autoimmune disorder, including at least two appointments per month at Children's Hospital. S.C. also testified that the parents had not attended any of T.C.'s doctor's appointments or surgeries. He further testified that T.C. visited with J.N. and A.C. regularly and that he intended to continue to foster a relationship between T.C. and his siblings.

Harrell testified at much greater length regarding DHR's efforts to rehabilitate the parents. She testified that the children first came into DHR's care because of T.C.'s injuries. She explained that the parents were not charged with abusing T.C. but that, as a result of the C/AN investigation, they had been found "indicated" for inadequate supervision of the children. *See* § 26–14–8(a)(1). Harrell said that DHR had provided several services to the parents, including random drug testing, referral to drug-treatment programs, "FOCUS" services to aid in reuniting the family, parenting classes, trans-

portation to visitation, and visitation with the children. She explained that the initial individualized service plan ("ISP") for the parents required them to seek drug assessment and treatment, to complete parenting classes, to find and maintain employment, to secure stable housing, and to undergo a domestic-violence assessment.

According to Harrell, the parents last visited with T.C. in September 2013, and they last visited with J.N. and A.C. in April 2014. The August 22, 2012, ISP indicates that the parents' visitation with the children was suspended in August 2012 because of the parents' noncompliance with their drug screens; none of ISPs from the following months indicate when the parents' visitation rights were reinstated, but the February 13, 2014, ISP indicates that visitation with the children would "continue" on certain days and times, indicating that visitation had resumed.[6] Although the ISPs contained in the record reflect that DHR had undertaken to provide transportation to the parents to visitations with the children beginning in October 2011, Harrell testified that DHR had stopped providing the parents transportation to visitations "around March of 2012" because the parents had missed several recent visits; the April 18, 2012, ISP contained in the record indicates that transportation services for visitations were actually terminated on April 18, 2012.[7] According to Harrell, DHR terminated transportation services for the parents because the parents were not availing themselves of the services as indicated by three consecutive missed visits and because of a shortage of case aides available to provide transportation.

In addition, although Harrell did not testify to this fact, the ISP dated April 18, 2012, added as a goal for the parents securing "access to reliable transportation." The ISP states specifically that the goal was added because of the parents' transportation difficulties and indicates that "[r]eliable transportation will be an essential responsibility when working toward[ ] reunification to ensure that the children's medical needs are able to be met." In August 2012, the ISP was updated to include as a requirement that each parent would acquire and maintain a valid driver's license; the transportation goal in the ISP included the requirement that each parent resolve any traffic tickets or fines that might be an impediment to receiving or reinstating a driver's license, which requirement the mother had yet to complete in August 2014, when DHR added to the ISP the notation that the mother still had $100 in traffic-related fines outstanding.

Harrell testified that the mother had admitted to her that she used marijuana. The mother tested positive for marijuana in hair-follicle testing conducted on August 23, 2012, and October 22, 2012; she tested positive for cocaine in hair-follicle testing conducted on January 16, 2014. The mother failed to appear for drug tests when required on August 11, 2014, April 25, 2013, April 11, 2013, August 9, 2012, and September 14, 2011; Harrell testified and the ISPs reflect that the parents were informed that a failure to appear at a drug screen would result in the screen being considered positive.

According to Harrell, the mother began the Chemical Addictions Program

6. In addition, as previously noted, the parents had last visited with T.C. in September 2013, thus indicating that visitation had resumed before that date.

7. Although Harrell testified that transportation services were terminated "around March

of 2012," the fact that transportation services were actually terminated on April 18, 2012, would comport with Harrell's testimony that the parents' failure to visit in late March and early April prompted the termination of transportation services.

("CAP"), a drug-treatment program in August 2012. However, according to Harrell, the mother did not complete the program, and the CAP records indicate that the mother was terminated from the program for noncompliance in December 2012 because she had missed several drug screens, had failed to pay for some of her drug screens, and had missed both group and individual counseling sessions. The CAP records also indicate that the mother's progress during her treatment changed from satisfactory to fair between October and November. Those notes also indicate that the CAP counselor had urged the mother to find employment so that she could pay for her drug screens. Although the ISPs reflect that drug treatment was a required component of rehabilitation, they do not reflect that the mother completed any other program; the August 11, 2014, ISP reflects that the mother was referred to a drug-treatment program located closer to her residence at that time, but no information regarding whether the mother had entered that program appears in the record.

The record reflects that the mother was unemployed during most of the time between the children's removal and the termination-of-parental-rights trial. Harrell testified and the August 22, 2012, ISP reflects that the mother was referred to Vocational Rehabilitation Services ("VRS") in August 2012 for assistance in seeking and retaining employment. The March 8, 2013, ISP indicates that the mother was employed at a restaurant at that time. However, the May 16, 2013, ISP reflects that the mother was no longer employed. The August 11, 2014, ISP reflects that the mother was instructed to see the counselor at VRS to re-enroll in VRS's program to assist her in seeking further employment. The record contains no evidence regarding whether the mother had resumed the program at VRS or whether she may have secured employment between the August 11, 2014, ISP and the date of trial.

The parents were required to attend parenting classes as part of their reunification plan. They attended parenting classes conducted by an entity called "Tools of Choice" and completed the necessary course work; however, an August 30, 2012, note on the August 22, 2012, ISP indicates that the parents had had only three months after completing their course work to complete the in-home supervision portion of the classes and that the three-month period had expired in June 2012. The March 8, 2013, ISP indicates that the parents were informed that they needed to contact Stephanie Roberts at Tools of Choice by April 5, 2013, to arrange to take a test to qualify for the in-home portion of the classes; the May 16, 2013, ISP reflects that neither parent contacted Roberts to make arrangements to take the test related to the parenting classes. The August 11, 2014, ISP states that the "parents must retake parenting classes."

The May 16, 2013, ISP reflects that the parents were also provided FOCUS services to aid in family reunification. The ISP stated that both parents would have to comply with the requirements for receiving the services, which included remaining drug-free, for them to continue. According to the July 9, 2013, ISP, FOCUS services were terminated because the father had tested positive for cocaine.

The parents also underwent a domestic-violence assessment as part of the reunification plan. Both parents denied domestic violence in the relationship, and DHR removed the requirement that the parents undergo counseling, because the assessment report contained no recommendations. Harrell testified, however, that she had received information from the mother that had led Harrell to believe that domestic violence had occurred in the household.

In fact, DHR provided counseling for the children to address domestic-violence issues. Harrell testified that she had seen a police report regarding an alleged domestic-violence incident between the parents in May 2014; no details of the incident were discussed, and the police report was not admitted into evidence.

Harrell testified on direct examination that, although the mother had lived in only two different residences while the children were in DHR's care, the mother had not secured "stable housing." Harrell testified that the mother had lived with the father's grandmother and that, at the time of trial, the mother was living with her grandmother, E.N. ("the great-grandmother"). On cross-examination, however, Harrell testified that she did not mean to say that the mother never achieved "stable housing" and that she did not mean to imply that the mother was required to live independently. In fact, Harrell explained that the ISPs did not require the mother to live independently. Harrell indicated that, despite the mother's having achieved *stable* housing, the mother may not have achieved *suitable* housing; Harrell testified that the mother had "indicated to [Harrell] that things weren't in order in [the great-grandmother's] house and never allowed [Harrell] to visit there to determine suitability."

Harrell admitted that DHR had required the mother to undergo a psychological evaluation as a part of the services provided by VRS. According to Harrell, the mother's IQ as reflected in VRS's evaluation was 75, which Harrell described as low or borderline. The juvenile court questioned whether the services offered the mother were tailored to what the juvenile court perceived to be her limitations; Harrell explained that, at times, accommo-

dations were made for those with mental limitations, but, she said, the mother had not presented as someone with limited mental functioning. In addition, Harrell stated that the mother had never asked for additional assistance with any of the materials provided in conjunction with any class or program or with any of the tasks required of her. Although the testimony regarding the mother's IQ score was admitted, the juvenile court excluded the mother's psychological examination from evidence.

Harrell testified, as noted above, that the father last visited T.C. in September 2013 and V.N. and A.C. in April 2014. She also testified that she had last had contact with the father in April 2014. She said that she had no telephone number by which to contact the father, that the father's last known residence had been destroyed, and that neither the mother, nor the father's mother, nor the father's last employer had an address or other method by which to contact the father. The father's counsel admitted that he had last had contact with the father in 2013. Thus, it was apparent that the father's whereabouts were unknown at the time of trial and had been unknown to DHR for approximately nine months, despite DHR's attempts to secure contact information for the father.[8]

Regarding the search for relative resources, Harrell testified that she had asked the mother several times at several ISP meetings for the names and contact information of any relatives who might be interested in assuming custody of the children but that the mother had provided only a few names. Harrell further testified that DHR had contacted R.E. and G.M., aunts of the mother, both of whom

---

8. Because the facts recited above support the conclusion that the father had abandoned the children, as will be discussed *infra,* we will not recite further evidence regarding the father's compliance with ISP goals.

had indicated that they would be unable to assume custody of the children. In addition, Harrell said, DHR had contacted N.C., the father's sister, and K.N., the mother's sister, both of whom had initially indicated interest in assuming custody of the children; however, neither woman had completed the process to be considered, which included submitting information required for background checks. Harrell testified that DHR had also contacted the great-grandmother, who had indicated that she was not in a position to take the children because she lacked sufficient space for them, and T.N., a cousin of the mother, who also stated that she was unable to assume custody of the children.

In its judgments, the juvenile court concluded that DHR had not made reasonable efforts to rehabilitate the parents. In reaching this conclusion, the juvenile court relied in large part on what it described as DHR's failure to provide appropriate transportation services for the parents so that they could meet the goals set for them in the ISPs. The juvenile court noted that the parents visited less frequently after DHR terminated transportation services in April 2012. Because the mother lived in rural Montgomery County, had no driver's license, and had no access to public transportation, the juvenile court commented, DHR should have been aware that transportation was an issue for her; thus, it concluded that DHR had not made reasonable efforts in this regard.

The juvenile court next indicated that DHR had improperly determined that the mother did not have a stable home despite the fact that she had lived in only two places—with the father's grandmother and with the great-grandmother—after the children entered DHR's care in 2011. Regarding DHR's alleged complaint that the mother could not live independently, the juvenile court stated that the mother was a high-school dropout who became pregnant at 16 and who had no substantial employment history; thus, the juvenile court reasoned, DHR's requiring the mother, who was 24 years old at the time of trial, to find independent housing was not a reasonable expectation. In fact, the juvenile court commented that "[i]t sometimes appears that DHR is out of touch with reality or [has] lost sight of its mission."

The juvenile court also found fault with what it characterized as DHR's failure to use reasonable efforts to assist the mother in locating employment. According to the juvenile court, DHR merely referred the mother to VRS "and did nothing else to assist the [mother] with attaining and maintaining employment." The juvenile court stated that, because the lack of employment arises frequently in dependency and termination-of-parental-rights cases, "[i]t would seem that DHR would be prepared to address this issue in a meaningful way outside [its] office."

In its lengthy judgments, the juvenile court continued to express displeasure over DHR's efforts in this case. Regarding the parenting classes, the juvenile court again found that DHR had not made reasonable efforts, stating that the parents' failure to complete parenting classes was "closely related" to DHR's failure to provide appropriate transportation services to the parents. Furthermore, the juvenile court determined that DHR had not made reasonable efforts to rehabilitate the mother because DHR had failed to follow the recommendations of the psychologist set out in a psychological evaluation performed on the mother at DHR's request in 2012. The juvenile court also stated that DHR had not taken any steps to address domestic violence that DHR suspected was occurring after the parents denied domestic violence in their domestic-violence assessment in 2011; rather inconsistently, the juvenile court noted that

DHR had not presented evidence of any domestic violence between the parties, although it noted that reference had been made to an incident in 2014. Finally, the juvenile court apparently concluded that DHR had not made reasonable efforts to address the parents' drug use, noting that the father's most recent drug screens in January 2014 had been negative, which, the juvenile court stated, indicated progress.

Ultimately, based upon what it determined to be DHR's failure to make reasonable efforts to rehabilitate the parents, the juvenile court concluded that it would be premature to terminate the parents' parental rights. The juvenile court determined that DHR had not proven by clear and convincing evidence "that the parents were unable or unwilling to discharge their responsibilities to and for the children or that their conduct or condition renders them unable to properly care for the children and that such conduct [or condition] was unlikely to change in the foreseeable future." In part, the juvenile court based that conclusion on the mother's psychological evaluation. The juvenile court also stated that it had doubts that the children were ever dependent because DHR had not proven that either of the parents had injured T.C. According to the juvenile court, less drastic options—most especially DHR's provision of transportation services—were available to preserve the family in this case. The juvenile court also indicated that DHR should "in good faith" consider those relatives that it had considered to have been advanced as viable alternatives too late in the process.

### Viable Alternatives to Termination of Parental Rights

■ As noted above, the juvenile court, in its judgments, referred to "relative resources that [DHR] determined to be too late," indicating perhaps that the juvenile court determined that DHR had not properly considered and had rejected relatives who might serve as resources for the children. Indeed, this court has held that the last-minute identification of a potential resource comes too late to serve as a barrier to a termination of parental rights. *See C.T. v. Calhoun Cty. Dep't of Human Res.,* 8 So.3d 984, 989 (Ala.Civ.App.2008); and *B.S. v. Cullman Cty. Dep't of Human Res.,* 865 So.2d 1188, 1196–97 (Ala.Civ.App. 2003). However, the juvenile court's apparent conclusion that DHR had rejected potential resources because they were advanced too late has no support in the record. Although the juvenile court questioned Harrell about why she had contacted some relatives in 2011 and others in January 2015, Harrell never once stated that DHR had rejected any potential relative resource because he or she was identified "too late" to be considered. Harrell testified that every relative whose name she had received had been asked if he or she would be willing to take custody of the children. The relatives to whom Harrell spoke in January 2015 were not rejected by DHR; both declined to take custody. Accordingly, any implicit finding by the juvenile court that DHR declined to consider certain relative resources because of tardiness is unsupported by the evidence of record.

### DHR's Appeal Regarding the Father

■ DHR argues that the juvenile court erred in failing to determine that the father had abandoned the children. "Abandonment" is defined in Ala.Code 1975, § 12–15–301(1), as "[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of

a parent." A determination that a parent has abandoned his or her child and that the "abandonment continues for a period of four months next preceding the filing of the petition" for termination of parental rights results in a "rebuttable presumption that the parent[ ] [is] unable or unwilling to act as [a] parent[ ]." Ala.Code 1975, § 12–15–319(b). Furthermore, "proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parent[ ]" in cases in which a parent has abandoned a child. § 12–15–319(a)(1).

Based on the evidence presented at trial regarding the father, we agree with DHR that it proved that the father had abandoned his children; indeed, the evidence presented at trial can support no other conclusion. The facts recited above clearly and convincingly establish that the father has withheld from J.N. and A.C. his "presence, care, love, protection, maintenance, or the opportunity for the display of filial affection" since at least April 2014; in the case of T.C., the father has withheld his "presence, care, love, protection, maintenance, or the opportunity for the display of filial affection" since September 2013, well more than four months preceding the filing of the amended termination petition in June 2014. § 12–15–301(1). The father did not maintain contact with his attorney and has not contacted DHR since at least April 2014. The father's whereabouts are unknown, and he left no forwarding address or contact information with DHR, the mother, his own mother, or his former employer. Because DHR has no duty to make reasonable efforts to rehabilitate a parent who has abandoned his or her child, § 12–15–319(a)(1), we need not consider whether the juvenile court correctly determined that DHR failed to make reasonable efforts regarding the father. Accordingly, as to the father, the judgments declining to terminate his parental rights are reversed.

## DHR's Appeal Regarding the Mother

■ DHR also argues that the juvenile court erred in failing to determine that it proved that the mother had abandoned the children. However, DHR never amended its complaint to allege that the mother had abandoned the children; DHR also did not make an argument before the juvenile court that the mother's parental rights should be terminated based on abandonment. This court cannot reverse the judgment of a juvenile court based on an argument first asserted on appeal. *S.A.T. v. E.D.*, 972 So.2d 804, 808 (Ala.Civ.App. 2007). Thus, we will not reverse the juvenile court's judgments based on DHR's argument that the mother abandoned her children.

DHR next argues that the juvenile court erred in determining that it failed to make reasonable efforts to rehabilitate the mother. DHR contends that it made reasonable efforts to provide necessary services to the mother but that she made no concomitant effort to avail herself of any services offered or to improve her circumstances for the well being of her children. We agree.

■ Before discussing the juvenile court's various findings regarding DHR's efforts to rehabilitate the mother, we must first address the juvenile court's reliance on the mother's psychological evaluation. Although the mother offered the psychological evaluation as an exhibit at trial, the juvenile court declined to admit it over objection. The juvenile court, however, relies on and quotes from the psychological evaluation in its judgments. Because the psychological evaluation was not admitted, the juvenile court erred in considering it and in relying on it. Because the exhibit was excluded, the juvenile court's findings, insofar as they are based the psychological evaluation, and its conclusion that DHR failed to make reasonable efforts because

it did not follow the recommendations outlined in that evaluation, are completely unsupported by the evidence of record. *Ex parte Professional Bus. Owners Ass'n Workers' Comp. Fund*, 867 So.2d 1099, 1102 (Ala.2003) (indicating, generally, that a court may not consider evidence that was determined to be inadmissible). Accordingly, we will disregard those findings in our discussion of the remaining findings and conclusions in the judgments.

We turn now to DHR's argument that the juvenile court erred in determining that DHR failed to make reasonable efforts. That DHR is generally required to make reasonable efforts to rehabilitate parents of dependent children cannot be questioned. *See T.B. v. Cullman Cty. Dep't of Human Res.*, 6 So.3d 1195, 1198 (Ala.Civ.App.2008). That is, DHR must make an effort to tailor services to best address the shortcomings of and the issues facing the parents. *See H.H. v. Baldwin Cty. Dep't of Human Res.*, 989 So.2d 1094, 1105 (Ala.Civ.App.2007) (opinion on return to remand)(per Moore, J., with two Judges concurring in the result). However, we have clearly stated that the law requires reasonable efforts, not maximal ones. *M.A.J. v. S.F.*, 994 So.2d 280, 291 (Ala.Civ. App.2008). Based on our review of the evidence, we cannot agree that DHR did not make reasonable efforts aimed at rehabilitating the mother during the three and a half years her children were in DHR's custody before the trial on the termination-of-parental-rights petitions.

DHR provided transportation to visitation for the mother beginning in October 2011. Although Harrell testified that transportation was discontinued "around March 2012," the ISPs in the record clearly indicate that transportation via case aide was discontinued on April 18, 2012, which was after, according to Harrell, the mother missed visits for which transportation was provided on March 28, 2012, April 4, 2012, and April 11, 2012. A parent's failure to avail themselves of the services provided to them should be considered when evaluating whether rehabilitation of the parents should continue or is failing. *A.M.F. v. Tuscaloosa Cty. Dep't of Human Res.*, 75 So.3d 1206, 1212 (Ala.Civ. App.2011). Unlike the juvenile court, we cannot fault DHR for discontinuing transportation services after the mother failed to avail herself of door-to-door transportation to visitation for three weeks in a row. To have continued to provide a service the mother declined to take advantage of would have been wasteful of the case aide's time and DHR's limited resources. In fact, as noted above, DHR made securing reliable transportation and a driver's license ISP goals for the mother; the mother had not completed either task at the time of trial. The mother's failure to avail herself of the transportation provided by DHR and her subsequent failure to secure a driver's license and reliable transportation rest squarely on her shoulders.

Furthermore, as we noted above, the juvenile court determined that DHR had failed to make reasonable efforts to assist the mother with locating and maintaining employment and participating in drug treatment. Although the juvenile court did not expressly state what it thought DHR should have done to further assist the mother with locating employment, we presume that the juvenile court concluded that the mother did not have access to employment because she lacked adequate access to reliable transportation. Similarly, we conclude that the juvenile court determined that DHR's failure to provide transportation also prevented the mother from completing drug treatment.

As part of its duty to make reasonable efforts to rehabilitate a parent with substance-abuse issues, DHR can provide drug screens, drug assessments, and refer

the parent to drug-treatment programs. DHR cannot make a parent take advantage of those services. The mother initially attended the CAP drug-treatment program; the record does not reflect that the mother informed DHR in 2012 that she lacked transportation to attend the CAP program. Records from CAP indicate that, although she admitted to her counselor that her marijuana use had resulted in the loss of custody of her children, the mother apparently lacked motivation to complete treatment because she did not follow the recommendations of her counselor, failed to pay for her drug screens, missed required drug screens, and missed both individual and group counseling sessions. More recently, DHR referred the mother to a drug-treatment program closer to her residence, but, as far as the record reflects, the mother made no efforts to attend that program.

Regarding employment, we note that the mother was provided services by VRS, which resulted in her briefly securing employment. However, the mother did not maintain employment for any length of time. In addition, she never made any effort to re-enroll in VRS's program for further assistance in locating employment, despite being instructed to do so. Without employment, the mother cannot provide financially for herself or for the children.

Based on our reading of the juvenile court's judgments, we conclude that the juvenile court seeks to impose on DHR a Herculean duty to do absolutely everything for a parent facing termination of his or her parental rights while imposing no duty on that same parent to make efforts to change the conduct, condition, or circumstance that gave rise to his or her child's dependency. This is an incorrect view of the principles underlying DHR's duty to make reasonable efforts to rehabilitate parents whose children have been removed from their custody. Central to a

determination whether reasonable efforts at rehabilitation have failed is not only the consideration whether a parent has complied with the reunification plan established in the ISPs so that "the parental conduct, condition, or circumstance that required separation of the child [can be] satisfactorily eliminated," *see R.T.B. v. Calhoun Cty. Dep't Human Res.,* 19 So.3d 198, 205 (Ala.Civ.App.2009), but also whether the parent has made "himself or herself available to DHR" and has made "an effort to address his or her issues and improve his or her circumstances." *A.M.F.,* 75 So.3d at 1212. In *A.M.F.* we relied on, in part, *In re Tiffany B.,* 228 S.W.3d 148, 159 (Tenn.Ct.App.2007), *overruled on other grounds, In re Kaliyah S.,* 455 S.W.3d 533, 555 (Tenn.2015), as authority for the aforementioned principle. The quotation we provided in the parenthetical explanation of the relevance of the citation to *In re Tiffany B.* is extremely apt here:

> " 'Reunification of a family, however, is a two-way street, and neither law nor policy requires the Department [of Children's Services] to accomplish reunification on its own without the assistance of the parents. Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody. They must also make reasonable efforts to rehabilitate themselves once services have been made available to them.' "

*A.M.F.,* 75 So.3d at 1212 (quoting *In re Tiffany B.,* 228 S.W.3d at 159).

DHR is to develop a plan to address the conditions of the parent, and it is to offer services to assist the parent in resolving those conditions, but it cannot take sole responsibility for rehabilitating a parent. A parent must take advantage of services offered to him or her and must take personal responsibility for his or her short-

comings and make actual efforts aimed at improving his or her circumstances. A parent's failure to do so supports the conclusion that the parent has failed to adjust his or her circumstances to meet the needs of his or her child.

A review of the ISPs contained in the record indicate that the mother attempted to comply with the requirements of the ISPs in the early months following the children's removal. However, the mother's failure to avail herself of the transportation DHR provided to her for three consecutive weeks prompted discontinuance of transportation services for visitations. She had not visited T.C. since September 2013 and had not visited V.N. and A.C. since April 2014. Her initial attempt to complete drug treatment failed, and she did not make a second attempt. She completed part of the parenting classes, only to fail to follow up with the provider as instructed. She secured employment for a brief period, but she did not maintain that employment, seek additional employment, or attempt to avail herself of the services offered by VRS a second time, despite being directed to do so. She did not make arrangements for reliable transportation or clear past-due traffic fines in order to secure a valid driver's license, despite having had a two-year period to do so. Although three and a half years had elapsed between the date her children were removed from her custody and the trial, the mother made no verifiable or sustainable progress on any ISP goal. The mother stopped complying with major portions of the ISP well before the trial in this matter. She even failed to attend the termination-of-parental rights trial. Thus, we conclude that the juvenile court erred in determining that DHR had not established that the mother had failed to adjust her circumstances to meet the needs of her children.

We have long held that a parent's good-faith efforts to change his or her circum-

stances must come to fruition in a timely manner or a child's need for permanency will outweigh those efforts, stating that, "[a]t some point, ... [a] child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent." *M.W. v. Houston Cty. Dep't of Human Res.*, 773 So.2d 484, 487 (Ala.Civ.App. 2000).

"[I]n *M.A.J. v. S.F.*, 994 So.2d 280, 291 (Ala.Civ.App.2008), this court held that the 12–month period between foster-care placement and the 12–month permanency hearing required by former Ala.Code 1975, § 12–15–62(c) [now § 12–15–315(a) ], is sufficient time within which the parents may 'prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.' In *M.A.J.*, we further held that the circumstances of a particular case should dictate the length of the rehabilitation period allowed a particular parent. *M.A.J.*, 994 So.2d at 291. (quoting *Talladega County Dep't of Human Res. v. M.E.P.*, 975 So.2d 370, 374 (Ala.Civ.App.2007)) ('"[T]he point at which the child's needs overcome the parent's right to be rehabilitated must be determined based on the facts of each individual case."')."

*B.J.K.A. v. Cleburne Cty. Dep't of Human Res.*, 28 So.3d 765, 771 (Ala.Civ.App.2009). The children had been in the care of DHR for nearly four years when the juvenile court entered its judgments. They deserve permanency.

The record does not reflect that the mother made more than minimal efforts at changing her circumstances to the benefit of her children. The juvenile court's conclusions that DHR did not prove that the mother was "unable or unwilling to discharge [her] responsibilities to and for the child[ren]" or "that the conduct or condi-

tion of the [mother] renders [her] unable to properly care for the child[ren] and that the conduct or condition is unlikely to change in the foreseeable future" are not supported by the evidence. The mother is living with the great-grandmother in a home that the mother herself deems unsuitable for her children, she is unemployed, she has not completed drug treatment, and she has neither reliable transportation nor a driver's license; in short, she has made no meaningful or sustained efforts to rehabilitate herself to become a suitable parent to her children. The mother has demonstrated indifference toward the children and toward her parental rights, as evidenced by her failure to attend the trial at which the termination of her parental rights was being considered. We cannot conceive of how the conduct and condition of the mother will render her, in the foreseeable future, able and willing to be a suitable parent to her children.

Because we cannot agree with the juvenile court that the evidence establishes that DHR failed to make reasonable efforts to rehabilitate the mother, failed to establish that the mother is unwilling or unable to parent her children, and failed to establish that the mother's conduct and condition is unlikely to change in the foreseeable future, we reverse the judgments of the juvenile court insofar as they declined to terminate the parental rights of the mother. The evidence clearly and convincingly supports the conclusion that the mother is unable and unwilling to discharge her responsibilities to and for the children, that she has failed to adjust her circumstances to benefit the children, and that her conduct or condition is unlikely to change in the foreseeable future. We therefore instruct the juvenile court on remand to enter a judgment in each case terminating the mother's parental rights to the pertinent child.

In addition, as noted above, we have concluded that the evidence establishes clearly, convincingly, and without question that the father, whose whereabouts are unknown to DHR and have been unknown to DHR since April 2014, abandoned the children. Accordingly, the judgments of the juvenile court, insofar as they declined to terminate his parental rights, are also reversed. On remand, the juvenile court is instructed to enter a judgment in each case terminating the parental rights of the father to the pertinent child.

In light of the length of time this matter has been pending in the juvenile court, we further instruct the juvenile court to enter the judgment in each case in an expeditious manner.

REVERSED AND REMANDED WITH INSTRUCTIONS.

THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.

MOORE, J., concurs in the rationale in part and concurs in the result.

MOORE, Judge, concurring in the rationale in part and concurring in the result.

The Montgomery County Department of Human Resources ("DHR") appeals from judgments of the Montgomery Juvenile Court ("the juvenile court") declining to terminate the parental rights of A.S.N. ("the mother") and J.E.C. ("the father") to T.C., J.N., and A.C. ("the children"). In those judgments, the juvenile court concluded that DHR had failed to present clear and convincing evidence of grounds for termination and that DHR had failed to prove that no viable alternatives existed to termination of the parents' parental rights. *See Ex parte Beasley,* 564 So.2d 950 (Ala.1990) (setting out State's burden in a termination-of-parental-rights proceeding).

## Standard of Review

The law presumes that natural parents will adequately perform their parental responsibilities to and for their children so that natural parents ordinarily should have custody of their children. *See Ex parte E.R.G.*, 73 So.3d 634 (Ala.2011). When the State petitions a court to terminate parental rights, the State must, as a matter of constitutional law, overcome that presumption by presenting clear and convincing evidence of parental unfitness. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Consistent with that standard, § 12–15–319, Ala.Code 1975, provides, in pertinent part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."

Conversely, a juvenile court may correctly refuse to terminate parental rights if it is not clearly convinced by the evidence that the parent cannot or will not adequately parent the child.

In this case, DHR argues that the juvenile court erred in determining that DHR failed to sustain its burden of proof. I have not located any Alabama caselaw specifically addressing the standard of review this court should employ to determine whether a juvenile court erred in concluding that DHR did not prove grounds for termination by sufficient evidence. As a general rule, this court may not reweigh the evidence in a termination-of-parental-rights proceeding. *See Ex parte T.V.*, 971 So.2d 1 (Ala.2007). Thus, it would seem that this court can determine only that the juvenile court erred in its weighing of the evidence if DHR is entitled to a judgment as a matter of law, i.e., that no evidence supports the factual determinations necessary to the judgment and that the evidence supports only a determination that grounds for termination exist. *See In re A.L.D.H.*, 373 S.W.3d 187, 192–93 (Tex. App.2012). By that standard, this court can reverse a juvenile court's judgment and order a juvenile court to terminate the parental rights of a parent only if the undisputed evidence requires that legal conclusion. I apply that standard when considering DHR's appeal in this case.

## The Father

DHR first argues that it proved that the parents had abandoned the children. Section 12–15–301(1), Ala.Code 1975, defines "abandonment" as:

> "A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

In *J.L. v. State Department of Human Resources*, 961 So.2d 839, 848–49 (Ala.Civ. App.2007), this court recognized that former § 26–18–3(1), Ala.Code 1975, the identically worded predecessor to § 12–15–301(1), established several alternative definitions of abandonment. Each of those definitions depend on the parents' voluntary, intentional, and unjustified conduct. *See H.H. v. Baldwin Cty. Dep't of Human Res.*, 989 So.2d 1094, 1103 (Ala.Civ.App. 2007) (opinion on return to remand) (Per Moore, J., with two Judges concurring in the result).

I agree with the main opinion that the evidence indisputably shows that the fa-

ther had abandoned the children. The record indicates that, when the children were removed from their home in July 2011, they were not residing with the father. DHR arranged weekly supervised visits between the children and the parents, but both the father and the mother complained of difficulties in obtaining transportation from Lapine, where the parents resided, to Montgomery, where the visits occurred. Given the lack of available public transportation, DHR arranged case-aide services to ameliorate that problem; however, DHR had only limited transportation resources available, so when the parents failed to contact DHR or to attend visits on March 28, April 4, and April 11, 2012, DHR discontinued case-aide services. Despite the discontinuation of those services, the parents continued to visit with the children, often borrowing a relative's automobile for transportation, until visitation was suspended in August 2012 when the parents failed to comply with their drug-screen protocol. At some point, visitation resumed. The parents last visited with T.C. in September 2013. The parents missed visits with J.N. and A.C. on March 13, March 27, and April 10, 2014, and they last visited with J.N. and A.C. on April 13, 2014. On August 11, 2014, DHR determined that the parents would have to produce negative drug screens in order to have their visitation reinstated. The parents never complied with that condition.

DHR conducted regular individualized-service-plan ("ISP") meetings. The father initially attended the ISP meetings in person or by telephone, but he last attended an ISP meeting on February 28, 2013. At the trial, the father's appointed counsel informed the juvenile court that he had not communicated with the father since two days before that ISP meeting. DHR completely lost contact with the father after April 13, 2014, despite repeated efforts to locate the father. In August 2014, Latoya Harrell, the DHR social worker overseeing the children's case, visited the father's last known address and found that the former residence had been completely razed. Harrell inquired of the mother and the children's paternal grandmother regarding the father's whereabouts, but she could not obtain a valid address for the father. In June 2014, DHR amended its petitions to allege that the father had abandoned the children, and DHR served those amended petitions on the father by publication. The father did not attend the trial.

In its judgments, the juvenile court did not address the claim that the father had abandoned the children. However, the evidence shows, without dispute, that the father had completely withdrawn from the children. The record contains no evidence to justify the complete and long-standing lack of contact between the father and the children. In the absence of such countervailing evidence, the only factual determination that could be reached is that the father had withheld from his children "his ... presence, care, love, protection, maintenance, or the opportunity for the display of filial affection," § 12–15–301(1), without good cause or excuse and that he had failed to claim his parental right to visitation. See § 12–15–102(23), Ala.Code 1975 (defining "residual parental rights" to include the right to visitation). As such, the only legal conclusions to be drawn from the undisputed evidence is that the father had abandoned the children and that the father was unwilling to discharge his parental responsibilities to and for the children.

Although under § 12–15–319(a)(1) proof of reasonable efforts is not required when a parent has abandoned a child, DHR does not argue that it should have been excused from making reasonable efforts to reunite the father with the children on the basis of his abandonment. Because DHR has

waived that argument, I do not join in that aspect of the main opinion that refuses to address the reasonableness of DHR's family-reunification efforts with regard to the father. 206 So.3d at 672. However, I do agree with the main opinion that DHR did use reasonable efforts, as explained later.

*The Mother*

I agree with the main opinion that DHR did not claim that the mother had abandoned the children at trial. 206 So.3d at 671. On appeal, DHR argues that it conclusively proved other grounds for termination of the mother's parental rights.

Despite the injuries to T.C., the juvenile court clearly did not consider the mother to be an abusive or neglectful parent. DHR argues that the juvenile court should have applied § 12-15-319(a)(6), which provides:

"In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"....

"(6) Unexplained serious physical injury to the child under those circumstances as would indicate that the injuries resulted from the intentional conduct or willful neglect of the parent."

However, the juvenile court reasonably could have determined that T.C.'s serious physical injuries were not "unexplained." The mother consistently reported that she had left T.C., who was less than three weeks old at the time, alone on a bed while she went to the restroom. The mother later found that T.C.'s right leg was swollen and surmised that one or both of her other children, who were then almost two and three years old, might have jumped on the bed and accidentally fell on T.C. The juvenile court found in its judgments that the mother's version of events had not been challenged.

Staff from Children's Hospital of Alabama, where T.C. was treated for his injuries, notified DHR of its suspicions that T.C.'s injuries had resulted from "nonaccidental trauma." *See* § 26-14-3, Ala.Code 1975 (requiring all hospitals to report suspected child abuse or neglect). DHR conducted a child-abuse-and-neglect investigation and issued a report that "indicated" the mother for inadequate supervision. *See* § 26-14-8(a)(1), Ala.Code 1975 ("Indicated" means "[w]hen credible evidence and professional judgment substantiates that an alleged perpetrator is responsible for child abuse or neglect."). However, Harrell testified that no one was ever convicted of a crime as a result of T.C.'s injuries and that "[t]here was no allegation that [the mother] did this to [T.C.]." DHR maintains that the mother "demonstrated a lack of supervision and protective capacity that placed T.C. and his siblings at risk of harm" and that the circumstances surrounding, and the nature of, T.C.'s injuries suggest that they resulted from the intentional conduct or willful neglect of the mother. However, the medical records refute DHR's contention that T.C. suffered a spiral femoral fracture, which would most likely result from a twisting of the bone consistent with intentional abuse, and, although the evidence could be viewed differently, the juvenile court reasonably could have determined that the circumstances did not indicate any intentional misconduct or willful neglect on the mother's part in leaving T.C. unsupervised while she went to the restroom.

The mother did not immediately seek medical treatment for T.C. DHR argues that the mother's behavior was reprehensible. DHR does not refute the juvenile court's findings that the mother contacted her physician the day after the injuries

and that the mother took the child to the physician and a Montgomery hospital emergency room within two days of the injuries when transportation became available. DHR presented no evidence indicating that the mother completely failed to treat T.C. during the two days following the injury. DHR also did not present any evidence indicating that the delay in treatment caused any further injury to T.C. Although the juvenile court could have reached the same conclusion as DHR, the juvenile court reasonably also could have determined that DHR had failed to present clear and convincing evidence indicating that the mother had willfully neglected the medical needs of T.C.

DHR maintains that the juvenile court should have terminated the parental rights of the mother based on her substance-abuse problem, her low cognitive functioning, her inability to meet T.C.'s special needs, her failure to pay child support, her inconsistent visitation and communication with the children, and her noncompliance with DHR'S rehabilitation plan. In its judgments, the juvenile court addressed most of those factors, particularly acknowledging that parental drug use is not in the best interests of children, but the juvenile court ultimately concluded that the mother's parental rights should not be terminated because DHR did not make reasonable efforts to correct the mother's deficiencies, which finding is addressed below.

### Reasonable Efforts

Many of the juvenile court's findings regarding reasonable efforts arise from its review of materials not contained in the record. In its judgments, the juvenile court refers to a January 26, 2015, court report, a domestic-violence assessment, a psychological evaluation, and a police report, none of which was admitted into evidence and, with the exception of the police report, none of which appear in the appel-late record. Disregarding the contents of those documents, the evidence in the record supports only one possible determination, that DHR made reasonable efforts.

After removing the children from the custody of the mother, DHR held an ISP meeting two days later. At that meeting, it was explained to the parents that DHR had become involved with the family as a result of the injuries that had been sustained by T.C. DHR advised the parents that, in order to end DHR'S involvement, the parents would have to cooperate with law enforcement and DHR in their investigation of those injuries, as well as remain "drug-free, obtain and demonstrate appropriate parenting knowledge and skills, receive and follow through with recommendations of a domestic violence assessment, maintain appropriate housing, obtain and maintain employment, as well as demonstrate the ability to properly provide for all the needs of their children." To those ends, DHR directed the parents to undergo a domestic-violence assessment, to submit to drug testing, to undergo parenting classes and demonstrate proper parenting techniques, to maintain a clean home, and to attend weekly visitations.

DHR arranged a domestic-violence assessment for the parents at the Family Sunshine Center, which they completed before October 5, 2011. In that assessment, both parents denied any involvement in domestic violence. Harrell indicated that DHR did not receive any recommendations for services relating to domestic violence based on the assessment. In the ISP plan from October 5, 2011, DHR "deleted" any requirement that the parents undergo domestic-violence rehabilitation. In its final judgments, the juvenile court criticized DHR for failing to provide counseling for the mother to address domestic violence; however, as the juvenile court itself concluded, the record contains no

clear and convincing evidence indicating that family-related domestic violence had ever occurred. The juvenile court speculated that the mother may have been a victim of domestic violence or sexual abuse at a young age based solely on information gleaned from records not admitted into evidence. Extrapolating from that speculative conclusion, the juvenile court further opined that the mother needed counseling to overcome the effects of her alleged abuse in order to effectively parent the children, although no such evidence appears in the record.

At some point before October 5, 2011, DHR referred the parents to parenting classes conducted by an entity named "Tools of Choice." The parents completed the course work for those classes in approximately May 2012; however, the parents did not take the final written examination. Furthermore, Tools of Choice requires parents to demonstrate the parenting skills they learn in the home under the supervision of an instructor within three months of the completion of the course work. The parents never started the in-home supervision portion of the parenting classes, and, despite DHR's instruction, the parents never contacted Tools of Choice to complete the parenting classes.

In its judgments, the juvenile court found that DHR had not used reasonable efforts "as to the parenting factor. Closely related to this failure, is the failure to provide transportation for the parties." The record contains no evidence indicating that the parents missed a single parenting class due to transportation problems. To the contrary, the record shows, without dispute, that the parents attended and completed the course work at Tools of Choice. The record contains no evidence indicating why the parents failed to take the final written examination, much less evidence that could support a finding that that failure resulted from some act or omission of DHR. Finally, any transportation problem would not have prevented the parents from participating in the last part of the parenting classes, which was supposed to take place in the parents' home.

Apparently as part of its routine procedure, DHR directed the parents to submit to drug testing. On January 18, 2012, the parents tested positive for illegal drugs and DHR referred them both to a Montgomery drug-rehabilitation center. The father began treatment in July 2012, and the mother entered an outpatient-treatment program at a separate facility in August 2012. The mother was discharged on December 26, 2012, for consistently missing drug screens and therapy sessions. The father tested positive for cocaine in June 2013, causing cessation of the services being offered to him by "FOCUS." Although DHR again required the father to complete drug treatment, the father did not fulfill that condition before he disappeared. In January 2014, the mother tested positive for cocaine. DHR referred the mother to another drug-treatment facility closer to the mother's home, but the mother never completed a drug-rehabilitation course.

The juvenile court questioned how the parents could attend drug rehabilitation without reliable transportation and determined that DHR did not use reasonable efforts to provide the parents that transportation. As explained above, DHR did provide transportation to the parents to facilitate visitation in early 2012, but the parents repeatedly failed to avail themselves of that service, which was available on only a limited basis. The record further shows that, afterward, DHR changed the ISP plan to require the parents to obtain their own reliable transportation. When a parent has rebuffed aid, such as transportation services, it is reasonable for

DHR to discontinue that form of assistance, *see generally A.M.F. v. Tuscaloosa Cty. Dep't of Human Res.*, 75 So.3d 1206, 1212 (Ala.Civ.App.2011), particularly at such a late stage in the rehabilitation process. *See M.A.J. v. S.F.*, 994 So.2d 280, 291 (Ala.Civ.App.2008) (establishing one year as the presumptive deadline for parental rehabilitation). In its judgments, the juvenile court completely overlooked the parents' culpability for their loss of transportation services.

The juvenile court also speculated that the mother's depression might have contributed to her failure to complete drug counseling. The record contains a brief reference to the a diagnosis of a depressive disorder, which was contained in the psychological evaluation that was not admitted into evidence. Harrell testified that she had seen no signs that the mother's depression had prevented her from functioning and meeting her ISP goals. The juvenile court received no other evidence regarding the effect of the mother's depression. Thus, the juvenile court had no evidentiary basis to excuse the mother from completing drug rehabilitation on the basis of her depression.

As for housing, DHR consistently required the parents to maintain clean and suitable shelter for the children. The record shows that the father's last residence had been destroyed and that DHR never acquired information as to his current whereabouts. Before July 9, 2011, the mother and the children resided in a home that they shared with the children's paternal grandmother and paternal great-grandmother. The mother continued to reside in that home for some period before moving in with her grandmother. Nothing in the record substantiates the juvenile court's finding that DHR required the mother to live independently, that DHR "held it against the [m]other" that she did not live independently, or that DHR otherwise considered "multi-generational" housing to be *per se* inadequate. Harrell testified that the mother would not allow DHR to inspect her current home to determine its suitability because, as the mother informed Harrell, "things were not in order in that house." Obviously, without a home inspection, DHR could not determine what efforts it needed to undertake to assist the mother in upgrading the house, and it would not have been reasonable to expect DHR to take any action to overcome the mother's lack of cooperation.

The juvenile court criticized DHR for failing to do anything to assist the parents in securing employment other than referring the mother to Vocational Rehabilitation Services ("VRS"). DHR itself is not an employment agency. Other than referring a parent to the state agency with particular employment expertise or making funds available to pursue the vocational-rehabilitation plan recommended by that agency, DHR can do nothing to vocationally rehabilitate a parent. The record contains no evidence indicating that DHR failed to act on any VRS recommendation. The juvenile court erroneously relied on information from the psychological evaluation that was not admitted into evidence to determine that DHR somehow frustrated the mother's reeducation and vocational goals.

Lastly, the undisputed evidence shows that, despite her low intellectual functioning, the mother did not require any special accommodations to assist with her rehabilitation. DHR did not violate its duty to make reasonable efforts by failing to modify its ISP to account for any mental deficiency the mother might have had.

In this case, the undisputed evidence shows that DHR made a fair and serious attempt to correct the parental conduct, conditions, and circumstances that separated the family. *See H.H. v. Baldwin Cty.*

*Dep't of Human Res.*, 989 So.2d at 1104–05. DHR identified the obstacles to family reunification, communicated its concerns to the parents, developed a reasonable plan tailored toward eliminating those obstacles, and continuously monitored and evaluated the progress of the parents. *Id.* at 1105. The law requires only reasonable, not maximal, efforts by DHR. *M.A.J.*, 994 So.2d at 291. The juvenile court clearly erred in finding that DHR did not meet its statutory duty.

*Remand Instructions*

The main opinion instructs the juvenile court to enter judgments terminating the parental rights of the mother and the father as expeditiously as possible. 206 So.3d at 675. Based on the peculiar facts of the case, I concur with that instruction. As a matter of law, the father is unwilling to discharge his parental responsibilities, as proven by the undisputed evidence of his abandonment of the children. The mother might not have intentionally harmed T.C. or willfully neglected his medical care, but the undisputed evidence shows a lack of effort by the mother to overcome her drug addiction, to provide the children with a suitable home, to consistently visit with and communicate with the children, and to otherwise adjust her circumstances to meet the needs of the children. *See* § 12–15–319(a).

DHR presented undisputed evidence of several factors that our legislature has mandated that juvenile courts must consider when deciding whether to terminate parental rights. The parents did not attend the trial. Their attorneys effectively cross-examined DHR'S witnesses on several points, but they did not rebut the evidence proving that the father had abandoned the children and that the mother could not or would not rehabilitate herself to assume a proper parental role. Applying the law to the undisputed facts, termi-

nation of the parents' parental rights is the only correct legal conclusion.