DONALDSON, Judge.
The Montgomery County Department of Human Resources (“DHR”) appeals from the judgment of the Montgomery Juvenile Court (“the juvenile court”) denying its petition to terminate the parental rights of T.S. (“the mother”) and K.A. (“the father”) to D.K.A. (“the child”). The judgment was entered following a trial that included the presentation of live testimony from many witnesses. The record shows that DHR presented evidence that, if found to be credible by the juvenile court, would support a decision that terminating the parental rights of the mother and the father is in the best interest of the child. The juvenile court did not, however, find the evidence presented by DHR to be credible and declined to terminate each parent’s parental rights. That decision cannot be reversed on appeal based on the applicable standard of appellate review.
The child was born on December 16, 2008, during the marriage of the mother and the father. DHR became involved with the family when the child was born because of DHR’s prior involvement with three of the mother’s older children.[1] The record indicates that the child was placed with the maternal grandmother after the mother and the father delegated their parental authority to the maternal grandmother, and DHR then terminated its involvement with the family at that time.[2] It is not clear from the record how long the child remained with the maternal grandmother before returning to the parents’ custody.
In December 2011, following a report of domestic violence between the parents, DHR filed a petition in the juvenile court seeking to have the child removed from the parents’ custody. The juvenile court entered an order granting DHR legal custody of the child, and the child was placed in foster care. That order is not contained in the record, and it is not clear whether the juvenile court made a finding of dependency at that time. On November 12, 2013, almost two years after DHR obtained custody of the child, DHR filed a petition to terminate both the mother’s and the father’s parental rights to the child. On May 2, 2014, DHR amended its petition to assert abandonment by the mother and the father as a ground for termination.
Section 12-15-320(a), Ala.Code 1975, requires “[t]hat the trial on the petition for termination of parental rights shall be completed within 90 days after service of process has been perfected.” The juvenile court did not conduct the trial in compliance with that statute. The juvenile court held hearings on the petition to terminate parental rights on 4 days over a 16-month period: April 16, 2014, August 12, 2015, August 19, 2015, and August 26, 2015. The record shows that DHR filed motions in the juvenile court on November 12, *1255 201-4, and March 11, 2015, requesting that the juvenile court resume and complete the trial on the petition. On June 15,2015, DHR filed a petition for a writ of mandamus seeking to have this court order the juvenile court to resume and complete the trial. This court denied the petition as moot on July 8, 2015, after receiving notice that the juvenile court had scheduled a date to resume the trial. Ex parte Montgomery Cty. Dep’t of Human Res. (No. 2140734, June 15, 2015), — So.3d — (Ala Civ.App.2015)(table).
Laura Sasser, a DHR child-abuse and neglect investigator, testified that DHR had conducted a child-abuse and neglect investigation in December 2011 that resulted in a.finding of “indicated” against the parents for domestic violence. The mother appealed that finding administratively, and the finding was upheld. Sasser testified that, although the domestic-violence incident was alleged to have occurred in October 2011, DHR was not notified by the Montgomery Police Department (“the MPD”) of the incident until November 28, 2011. Sasser testified that the mother told her that the child was present during the domestic-violence incident:
“[DHR’s attorney:] And was [the child] ever present when any abuse occurred?
“[Sasser:] Yes, she was present during domestic violence.
“[DHR’s attorney:] How do you know that?
“[Sasser:] Per the mother’s statement.”
Sasser also testified that she discovered during her investigation that there was little food in the mother’s apartment and that the child’s clothing was too small.
Latoya Harrell was the DHR social worker assigned to the child’s case from 2011 to 2015. Harrell testified that she conducted six comprehensive family assessments on the family-irom 2011 through 2015 and that she conducted nine individualized service plan (“ISP”) meetings with the family between December 2011 and February 2015. Harrell testified that the mother had three older children who had all been placed with relatives due to the mother’s inability to care for -those children. Harrell also testified that the mother had a history of depression and mood swings.
Harrell testified that the mother told her that the child had been exposed to domestic violence between the parents:
“[DHR’s attorney:] ... [D]id [the mother] admit to you that [the child] was, in fact, being exposed to domestic violence?
“[Harrell:] Yes.
“[DHR’s attorney:] Was it on more than one occasion?
“[Harrell:] Yes.”
Harrell recommended that the mother go to a domestic-violence shelter, but the mother refused. Harrell referred the case for a domestic-violence assessment. That assessment resulted in recommendations for the mother to receive counseling at a facility described as the Sunshine Cehter and to seek a restraining order against the father, among other things. DHR set the following ISP goals for both parents' to achieve for reunification with the child: complete a domestic-violence assessment at the Sunshine Center; maintain contact with DHR; maintain contact with the child through regular visitation; obtain psychological evaluations; complete parenting classes; and achieve and maintain a sáfe, stable, and permanent living condition. Additionally, the mother was instructed to initiate domestic-abuse counseling and the father was instructed to complete a batterers’ intervention program.
*1256 The record shows that the mother attended two counseling sessions at the Sunshine Center, but she did not seek a restraining order against the father. The mother and the father obtained the required psychological evaluations, which were conducted by Dr. Curry Hammack. Those evaluations revealed, among other things, that the father’s cognitive functioning level was in the mild mental-retardation range and that the mother’s level was in the upper mild mental-retardation range.
Harrell testified that the father did not attend the batterers’ intervention program as required but that he did attend a two-hour anger-management class at another facility. Harrell testified that the father did not appear to understand the severity of the situation and did not feel that he put the child in danger when he physically abused the mother. Harrell testified that, although he had completed parenting classes, the father was not able to exhibit any understanding of what he had learned in those classes and that he did not seem to have an acceptable understanding of child development, the age-appropriate skills of a child, or how to communicate with and nurture a child.
Harrell testified that the parents initially had one-hour visitation times with the child and that they rotated visitation every other week. Harrell testified that the visitation was discontinued after the mother repeatedly failed to attend visitation and after the father became incarcerated in December 2013. Harrell testified that DHR had provided transportation and bus passes to the parents to enable them to attend visitation. The evidence indicated that DHR referred the parents to a program known as Family Outcome Centered Unification Services (“FOCUS”)[3] in June 2013 for a reunification assessment and to an entity named Alliance Continuum of Care (“Alliance”) in November 2013 for in-home reunification services. The record shows that Alliance terminated its services because of the parents’ lack of participation. Harrell testified that the mother failed to maintain regular contact with DHR after December 2013. Harrell testified that the mother contacted DHR in October 2014 and asked if she could bring presents for the child. Harrell testified that the mother never delivered any presents. Harrell also testified that she had investigated potential relative resources for the child.
Bernita Bailey, a FOCUS worker, performed an evaluation of the mother and the father over a 14-day period in June 2013 to assess their parental capacities. Bailey testified that she noted the mental deficiencies of the parents and that she tailored her questions and her assessment to the parents’ mental abilities. Bailey testified that she worked with the parents regarding proper nutrition, discipline, and parenting. Bailey testified that the parents could not explain or apply the information they had been taught in parenting classes and in one-on-one discussions. Bailey testified that the child could not be reunited with the parents due to the parents’ mental deficiencies. Bailey testified that her last contact with the parents was in July 2013 because she had not received another referral from DHR to perform an additional assessment. Bailey believed, however, based on her assessment, that the parents’ mental deficiencies would impair their parenting abilities.
Carrie Nelson, the FOCUS supervisor, testified about the assessment conducted by FOCUS. Nelson testified that the par *1257 ents had severe problems with parenting skills and that they did not understand the concepts of rules and consequences for misbehavior. Nelson testified that FOCUS uses the same tools to perform assessments for everyone and that they do not provide a different assessment tailored to a person’s mental ability. Nelson testified that the FOCUS assessment makes recommendations and is not a treatment plan. FOCUS predicted that the parents would be unable to provide care and basic needs for the child, to maintain a stable living environment, to manage their finances, to seek resources, or to assist the child with her education; thus, FOCUS recommended against reunifying the parents and the child.
Wilma Jackson was the DHR caseworker for the four months preceding the August 2015 resumption of the trial. She testified that the mother had failed to maintain contact with DHR. She testified that she had located the mother through the maternal grandmother and had met with her in July 2015 for approximately 30 minutes. Jackson testified that, even though she met only briefly with the mother, she did not believe that the mother could discharge her parental responsibilities, although the mother had indicated a willingness to parent the child. Jackson testified that the telephone number the mother had provided to DHR was no longer working in August 2015. Jackson testified that she followed up with the potential relative resources that the parents had provided but that none were able or willing to serve as a relative resource for the child.
The mother testified that she was willing and able to raise the child. The mother denied having any cognitive or mental impairments. She testified that she had graduated from high school. The mother testified that she had been living in the same trailer for two years at the time of the August 2015 hearings. She then testified that she had lived off and on at her sister’s apartment during that same time while the trailer was being prepared. She also testified that she had lived in a different trailer in that same trailer park at some point during the past two years. The mother testified that, before she lived in the trailer park, she had lived in a duplex and had lived off and on with her mother and other relatives. Before that, the mother lived in an apartment after she had been evicted from another apartment. The mother testified that she receives disability benefits for seizures but that, at the time of her testimony in August 2015, she had been employed for two months as an insurance salesperson. However, the mother testified that she had not yet been paid for her work in that employment and that she did not intend on returning to that employment. The mother testified that she was still married to the father but that she was living with her fiancé.
Regarding her failure to maintain contact with the child since 2013, the mother testified that she had tried to contact DHR by telephone but that no one would return her calls:
“[The guardian ad litem:] I just want to know why it is you have not reached out and done what you had to do over the past 20 months to get your child back?
“[The mother:] Back then I was feeling discouraged.
“[The guardian ad litem:] Not back then. I’m talking about two weeks ago to 20 months ago. You came back into the picture, my understanding, the day before our hearing, which was three weeks ago. So from the time frame of December 13th until three weeks ago, would you say you have done anything to get your child back?
*1258 ;,“[The mother:] I’m not going to say I have .done anything to get her back, but I have been putting efforts to stay in .touch with my caseworkers and no one have [sic] returned my calls.”
The mother testified that she stopped visiting-with the child due to a lack of funds and transportation. The mother testified that she had provided DHR with only the names of two of her sisters as potential relative resources.
The father remained incarcerated at the time of the termination hearings, awaiting trial on charges of first-degree burglary, kidnapping, rape, robbery, and two counts of sodomy. The father submitted testimony in the form of answers’ to' interrogatories in which he asserted a willingness and an ability to care for the child. He admitted that he and the mother had “passed licks back and forth” but denied that he had been “abusive.” Since his incarceration, the father had written one letter to the child. The guardian ad' litem recommended against giving the letter to the child because of inappropriate promises from the father contained in the letter, and DHR did not give the letter to the child. The-.father had also been incarcerated when he was younger as the result of an incident in which he had stabbed a person.
. - -The child had not lived with the mother or the father since she was- removed from the-parents’' home in December 2011, and she had been living with her current foster mother since September 2013. The evidence indicated that the child had bonded with the foster mother and was thriving in her environment. The foster mother testified that - she had been caring for the child’s medical needs, including administering daily breathing treatments for the child’s asthma, and accommodating for the child’s shellfish allergy. The child underwent a psychological evaluation in January 2015. The child was diagnosed with “Adjustment Disorder with Mixed Disturbance of Mood and Behavior” and attention deficit hyperactivity disorder. The evaluating psychiatrist recommended, among other things,. a structured environment for the child with a predictable and reliable schedule, a consistent and conventional sleep schedule, and a stimulating environment with enriched cultural experiences. While in the foster mother’s care, the child had been attending summer and after-school programs at the YMCA where she participated in swimming and dancing. The child was also enrolled in private swimming lessons, piano lessons, and ballet lessons.
The evidence indicated that the father initially provided the name of L.J., his aunt, as a potential relative resource. L.J. informed DHR that she was unable to care for the child because she was already caring for other children, L,J. suggested DHR contact G.A., a'paternal relative from Ohio. G.A. informed DHR that she had health issues and a son with a criminal record living with her, and she declined to serve as a relative resource for the child. The father also provided the name of A.C. as a potential relative resource two weeks before the resumption of the trial in August. The relationship of A.C. to the child is not in the record. DHR did not consider this potential resource.
Harrell testified that the mother provided the names of E.S., a family friend, and K.K., a maternal aunt that lived in Oklahoma, as potential relative resources. DHR advised both E.S. and K.K. how to file a petition for temporary custody, but neither did so. DHR also contacted B.J.S., the maternal grandmother, and L.M., the maternal great-aunt, about serving as a custodian of the child. L.M. never filed a petition for custody. B.J.S. visited with the child on one occasion and filed a *1259 petition for custody, but she subsequently withdrew the petition,
Harrell testified that DHR also attempted to contact A.M., the maternal great-aunt, and R.M., the maternal grandfather, but DHR was unable to make contact with either person. Harrell testified that she contacted Br.S., the maternal aunt, who initially indicated that she would serve as a relative resource, but Br.S. did not follow through with filing a petition. Jackson testified that she attempted to follow up with Br.S. but that the telephone number for Br.S; would not receive incoming calls. Jackson had an address for Br.S. but did not send a letter to her. The evidence indicated that DHR was unable to make contact with any other potential relative resources.
As noted, although DHR filed the petition to terminate the parental rights of the parents in November 2013, the final hearing did not conclude until August 26, 2015. In addition to the deadline for conducting a trial noted earlier, § 12-15-320(a) also requires that “[t]he trial court judge shall enter a final order within 30 days of the completion of the trial.” On September 25, 2015, DHR filed a motion requesting, that the juvenile court enter a final judgment. On October-7, 2015, the guardian ad litem filed a recommendation that the juvenile court terminate the parental rights of both the mother and the father. On October 8, 2015, DHR filed another petition for a writ of mandamus seeking to have this court order the juvenile court to enter a final judgment. This court- dismissed the petition as moot on November 4, 2015, after receiving notice that the juvenile court had entered a final judgment on October 26, 2015. Ex parte Montgomery Cty Dep’t of Human Res. (No. 2150016, Nov. 4, 2015), — So.3d — (Ala.Civ.App.2015)(table).
In the October 26, 2015, judgment, the juvenile court declined to terminate the parental rights of the mother and the father. The child was six years old at the time the judgment was entered, and she had been in DHR’s custody for almost four years. The judgment, which is 35 pages long, contains extensive findings of fact and conclusions of law, including the following:
“The first issue for review is whether [DHR] has presented clear and convincing evidence in support of its Petition for Termination of. Parental Rights. Secondly, there must also be a determination of whether viable alternatives to termination of parental rights exist. ■
“Each Parent’s case-must be analyzed separately. The trial court finds that in each instance [DHR] failed to present clear and convincing evidence in support of its [termination-of-parental-rights] Petition. Secondly, this Court is placed in the unfortunate position of not being able to identify the name of a relative resource that is an alternatives as it finds that [DHR] did not exercise reasonable efforts in investigating the relative resources . whose names appear throughout DHR’s records. Further, this court is of the opinion that based on the failure, of [DHR] to meet the legal standards under the first prong, it is now unnecessary-to address the second prong of the two part analysis for termination.
“Specifically, the facts establish that the precipitating event of domestic violence (DV) that led to [DHR’s] wrongful removal of the Minor Child from the stable home that she shared with her Parents do [sic] not support the arguments of [DHR] that the Minor Child witnessed domestic violence in her home and further that she was placed of risk of harm....
*1260 “Secondly, low intelligence Quotients (IQs) were an issue in this case. The Psychological Evaluations performed by Dr. Hammack clearly show that the Parents’ IQs were low....”
In the judgment, the juvenile court expressed numerous concerns regarding DHR’s efforts and actions in this case. The juvenile court concluded:
“The Montgomery County Department of Human Resources (DHR) failed to meet its legal burden of supporting its case with clear and convincing evidence. Based on the legal standards, [DHR] is mandated to immediately begin reunification efforts with [the child’s] Parents. The reunification efforts must be implemented in a good faith manner. Hereafter, this matter shall be set for monthly review.”
On November 9, 2015, DHR filed a motion to alter, amend, or vacate the judgment on numerous grounds. One ground asserted by DHR was that the judgment relied upon a report prepared by the MPD regarding the domestic-violence incident of October 2011 that had not been admitted into evidence. The juvenile court entered an order denying DHR’s postjudgment motion on November 23, 2015. On November 24, 2015, the juvenile court entered another order purporting to address the issue of its reliance on the MPD report. The November 24, 2015, order indicates that some type of conference was held on November 23 regarding the MPD report and states, in part:
“The court requested additional time, fourteen days, to consider [DHR’s] Motion to Alter, Amend or Vacate. The same was agreed upon by all parties with the exception of [DHR]. Accordingly, as the undersigned is not satisfied with unresolved questions pertaining to the police report, the court is of the opinion that it is necessary that this matter be further addressed pursuant to a Show Cause Order.
“Based on the foregoing, counsel shall file with the court a written response/explanation as to the inconsistency between the Petition for Termination of Parental Rights and the police report which admittedly was in the possession and control of [DHR] prior to the [termination-of-parental-rights] hearing and seemingly in DHR’s possession prior to the removal of the Minor Child.”
The juvenile court then referred to the MPD report as a “material document.” Regarding DHR’s claim that the document was not part of the record, the juvenile court stated:
“Although referenced by three attorneys, to include DHR’s counsel, and used during the [termination-of-parental-rights] proceeding, DHR argues that the police report is not a part of the record and therefore should not have been evidence considered by this court. This court is of the opinion that even if it is subsequently determined that the police report is not of record, that the court must determine whether [DHR] violated its responsibility to the court by failing to disclose the content of the police report that specifically shows that the Minor Child was not present at the home of the Parties where and when the alleged domestic violence occurred. This is a separate issue and- is material in determining whether this matter should have ever been initiated based on domestic violence that the Minor Child witnessed.”
At the time the November 24, 2015, order was entered, DHR’s postjudgment motion had already been denied. The juvenile court therefore did not have jurisdiction to enter the November 24, 2015, order. See Faith Props., LLC v. First Commercial Bank, 988 So.2d 485, 491 (Ala. *1261 2008) (quoting Pinkerton Sec. & Investigation Servs., Inc. v. Chamblee, 961 So.2d 97, 102 (Ala.2006)) (holding that, “[a]fter the denial of a postjudgment motion directed at a final judgment, ‘the trial court loses jurisdiction over the action’ ”). On December 1, 2015, DHR timely filed a notice of appeal to this court.
On appeal, DHR asserts that it presented clear and convincing evidence that the child was dependent, that the parents were unwilling or unable to parent the child, and that no viable alternative to the termination of parental rights existed, and, therefore, it asserts, the juvenile court’s judgment refusing to terminate the parental rights of the mother and the father must be reversed as being plainly and palpably wrong. Section § 12-15-319, Ala.Code 1975, governs the termination of parental rights and provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.... ”
Our standard of review of a juvenile court’s decision on a petition to terminate parental rights is well settled.
“The juvenile court’s judgment based on ... ore tends evidence is presumed to be correct and will not be overturned absent a showing that the judgment is plainly and palpably wrong. S.B.L. v. Cleburne County Dep’t of Human Res., 881 So.2d 1029, 1031-32 (Ala.Civ.App.2003).
“ ‘ “A parent has a prima facie right' to custody of his or her child and this right can be overcome only by clear and convincing evidence that the child’s best interests would be served by permanently terminating the parent’s custody.” Ex parte State Dep’t of Human Res., 624 So.2d 589, 591 (Ala.1993) (citing R.C.M. v. State Dep’t of Human Res., 601 So.2d 100 (Ala.Civ.App.1991)). When the State is petitioning to terminate a parent’s parental rights, the trial court must first determine if the child is dependent and then must examine whether all viable alternatives to termination have been explored. Ex parte Beasley, 564 So.2d 950 (Ala.1990). On appeal, the trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte State Dep’t of Human Res., supra.’
“W.C. v. State Dep’t of Human Res., 887 So.2d 251, 256 (Ala.Civ.App.2003). The paramount consideration in a case involving the termination of parental rights is the best interests of the children. Q.F. v. Madison County Dep’t of Human Res., 891 So.2d 330, 335 (Ala.Civ.App.2004); S.B.L. v. Cleburne County Dep’t of Human Res., 881 So.2d at 1032; and J.L. v. State Dep’t of Human Res., 688 So.2d 868, 869 (Ala.Civ.App.1997).”
C.T. v. Calhoun Cty. Dep’t of Human Res., 8 So.3d 984, 987 (Ala.Civ.App.2008). See Ex parte McInish, 47 So.3d 767 (Ala.2008) (explaining standard of review of judgments that rest on factual determinations that are required to be based on clear and convincing evidence).
In its judgment, the juvenile court found, among other things, that DHR *1262 “failed to provide clear and convincing evidence in support of its [termination-of-parental-rights] petition.” DHR argues that the evidence established that the child was dependent because, among other reasons, the parents abandoned the child. “Abandonment” is defined as
“[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
§ 12-15-301(1), Ala.Code 1975. Pursuant to § 12-15-319(b), Ala.Code 1975, abandonment that continues for a period of four months gives rise to a rebuttable presumption that the parents are unable or unwilling to act as parents.
The juvenile court does not explicitly address the issue of abandonment in its judgment. We must therefore assume that the juvenile court made those findings necessary to support a determination that the parents did not abandon the child, unless that finding is unsupported by the evidence. Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.l996)(holding that, “in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous”); see also F.I. v. State Dep’t of Human Res., 975 So.2d 969, 973 (Ala.Civ.App.2007)(noting that appellate courts “typically assume that a juvenile court makes those findings necessary to support its judgment”).
Although the juvenile court did not specifically address the issue of abandonment, the juvenile court made specific findings regarding the parents’ lack of contact with the child. The juvenile court found that
“DHR failed to make reasonable efforts as to visitation and/or maintaining contact between the Minor Child and her Parents. One hour dedicated weekly for visitation is insufficient to maintain a quality relationship between the Minor Child and Parents. It is even more egregious that [DHR] terminated the visitation of the Mother when the Father was incarcerated.”
Based on that finding, the juvenile court could have determined that the parents did not abandon the child. The evidence is undisputed that the last occasion on which either parent had visitation with the child was December 2013. The father was arrested in December 2013 on multiple felony charges and remained incarcerated on those pending charges at the time the judgment was entered. The juvenile court found that the father had attempted to maintain contact with the child during his incarceration by sending a letter to the child. In his interrogatory responses, the father testified that he wants to raise his daughter and that he has the ability to support her.
We note that, “[i]n cases where the testimony is in dispute, the [juvenile] court is free to choose which evidence to believe and to resolve the conflicts within its discretion.” McNutt v. McNutt, 593 So.2d 1032, 1033 (Ala.Civ.App.1992) (citing Watkins v. Montgomery Days Inn, 455 So.2d 23 (Ala.Civ.App.1984)). Furthermore, “[i]t is not the duty of this court to weigh the evidence; rather, we must indulge all favorable presumptions to sustain the [juvenile] court’s judgment.” Id. (citing Gann & Lewis Roofing Co. v. Sokol, 359 So.2d 815 (Ala.Civ.App.1978)).
On direct examination, when asked about her visitation, the mother testified as follows:
*1263 “[The mother’s attorney:] Can you explain to the court why you stopped making visits?
“[The mother:] At the time I didn’t have transportation and it was a lot on me going back and forth seeing her and stuff.”
The record shows that when the mother testified that she did not' remember the last date on which she saw the child, the juvenile court asked whether the mother remembered anything about that last visit. The mother responded:
“Other than the last time I came to visit with my daughter a year before last was when Latoya [Harrell] turned me back around and told me she was not going to visit with [the child] because of that stuff her daddy had did to someone kids¡ over and the robbery that he had did. And that is when I stop going to see my daughter.”
In its judgment, the juvenile court found that the mother had not visited with the child because she had been prevented from doing so by DHR: “[The mother] testified that visitation was stopped when caseworker Harrell told her that she was not going to let her visit [the child] anymore based on what [the father] is alleged to have done to another child.” The juvenile court further commented that “[i]t is even more egregious that [DHR] terminated the visitation of the Mother when the Father was incarcerated.”
Thus, the juvenile court chose to believe that DHR had prevented the mother from visiting the child. The juvenile court has the discretion to believe or disbelieve any portion of a witness’s testimony, See McNutt, 593 So.2d at 1033. Therefore, in light of the conflicting evidence, the juvenile court, as the sole judge of the credibility of the witnesses, could have determined that the mother did not abandon the child, but that DHR had terminated visitation between 'the mother and the child, and that the father, by attempting to reach out to'the child during his incarceration awaiting trial, did not intend to abandon the child. See Murphree v. Murphree, 579 So.2d 634, 636 (Ala.Civ. App.1991) (holding that, “[w]hen the trial court resolves conflicts in testimony, its judgment will not be set aside and replaced, with the judgment of the appellate court”). “It is our duty to affirm the trial court’s judgment if it is fairly supported.by credible evidence, ‘regardless of our own view of that evidence or whether we would have reached a different result had we been the trial judge.’ ” Griggs v. Griggs, 638 So.2d 916, 918-19 (Ala.Ciy.App.1994) (quoting Young v. Young, 376 So.2d 737, 739 (Ala.Civ.App.1979)).
“In a nonjury trial, the trial pourt is the trier of facts. As such, it is the sole judge of the evidence and of the credibility of witnesses, and the trial court should accept only that testimony which it considers to be worthy of belief.. In determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness, the witness’s apparent, candor or evasiveness, or the existence or nonexistence of any bias or interest.”
Ostrander v. Ostrander, 517 So.2d 3, 4-5 (Ala.Civ.App.1987).
DHR also argues that the child was dependent because the parents had mental deficiencies that prevented them from caring for the child. See § ■ 12-15-319(a)(2) (providing that, in.determining whether to terminate a parent’s rights, the juvenile court shall consider “mental illness, or mental deficiency of the parent ... of a duration or nature as to render the parent unable to care for needs of the child”). In its judgment, the juvenile court acknowledged the parents’ mental deficiencies but found that the deficiencies did not prevent *1264 the mother and the father from parenting the child, and it found that DHR had failed to make accommodations for those deficiencies. Specifically, the juvenile court found, among other things, that,
“[njotwithstanding mental health or diminished mental capacity, seemingly, the Parents were able to function as Parents, it appears that the Parents did what they could do with the limited resources they had. Obviously, DHR expected more. Perhaps, they could have done better with the right accommodations.”
The juvenile court also found that
“it is undisputed that both the Mother and Father had issues related to mental comprehension. However, the evidence of the aforementioned issue does not mean that the Mother and Father had an inability to parent the Minor Child. It appears that before the disruption by [DHR] that the family was functioning. The same was suggested by Dr. Ham-mack when he noted that if the Mother had in fact provided the care for the Minor Child for the three year period prior to the Minor Child’s removal from the home, then it lends credence to the Mother’s testimony that she is able to care for [the child].... ”
Although Bailey, a FOCUS worker, testified that she determined that the parents were unable to discharge their responsibilities based on their mental impairments, the FOCUS assessment occurred in 2013. The mother testified at the trial, and the juvenile court had the opportunity to view her demeanor. See Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986) (“The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.”). In addition, Harrell and the mother both testified that the parents had provided the care for the child during the first three years of the child’s life. Therefore, based on the conflicting evidence and its assessment of the credibility of the witnesses, the juvenile court could have concluded that the parents’ mental impairments would not prevent them from caring for the child.
DHR also argues that the child was dependent because reasonable efforts aimed at reunification had failed and that the parents had failed to change their circumstances to meet the needs of the child. See § 12-15-319(a)(12) (providing that, in determining whether to terminate a parent’s rights, the juvenile court shall consider “[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child.... ”). “Whether efforts at reunification have been reasonable and whether those efforts have failed or succeeded are questions of fact for the juvenile court to determine.” R.T.B. v. Calhoun Cty. Dep’t of Human Res., 19 So.3d 198, 204 (Ala.Civ.App.2009) (citing T.B. v. Cullman Cty. Dep’t of Human Res., 6 So.3d 1195, 1199 (Ala.Civ.App.2008)).
The juvenile court found that DHR had failed to make reasonable efforts to reunify the family and had failed to make accommodations for the parents’ mental impairments. Specifically, the juvenile court noted that
“low Intelligence Quotients (IQs) were an issue in this case. The Psychological Evaluations performed by Dr. Hammack clearly show that the Parents’ IQs were low. Dr. Hammack was retained by the DHR to conduct the Psychological Evaluation for both Parents. Thus, the DHR was placed on notice that the Parents may have issues relating to some form of mental health or diminished mental capacity in February of 2012. Although DHR had this information within its control and possession, it did *1265 nothing with this information to accommodate the Parents’ learning disabilities which likely affected their inability to complete the parenting classes. This then is of immense concern to the Court, as DHR used the parents’ failure to complete certain parenting programs against them. The record is void [sic] of any assistance provided the Parents in this regard....
“This Court is of the opinion that these Parents desired to do the right things for [the child] and remain willing to parent their daughter. The record clearly shows that the Mother attended every Individualized Service Plan(s) (ISP) meeting before the Father was incarcerated. The Father attended every ISP [meeting] that he was invited to attend before he was incarcerated. The Parents otherwise completed the requirements placed upon them by DHR, to include a domestic violence assessment, psychological evaluation, a parenting class at the Family Guidance Center and Anger Management [classes].
“The Court also notes that DHR argued that the Parents did not provide stable housing and did not know how to manage their resources. However, a review of the ISPs shows that housing and management of finances did not become issues for DHR until the ISP meeting of November 7, 2013. This was the very day that DHR filed its [termination-of-parental-rights] Petition. It does not seem equitable to the Parties to report that ‘housing stability1 was the strength of the Mother throughout the ISP process and then report that it was ‘not’ on the same day that the [termination of parental rights] [petition] was filed, but then not give the Parents an opportunity to take any needed corrective action.”
We note that the finding that the parents “otherwise completed the requirements placed upon them by DHR” does not appear to be supported by the evidence because it was undisputed that the parents did not complete all the requirements imposed by DHR. Although the parents completed parenting classes at the Family Guidance Center, Harrell testified that the parents were supposed to complete the “Tools of Choice” parenting program, which is much more intensive and “hands-on” than the classes offered through the Family Guidance Center. The evidence indicated that the Tools of Choice program would no longer allow the mother to enroll in classes because she had previously enrolled four times without completing the program. The mother also failed to complete domestic-violence counseling and seek psychiatric treatment. The father failed to attend the batterers’ intervention program as required. DHR referred the parents to Alliance for in-home reunification services, but that organization discontinued its services because the parents failed to participate.
Likewise, the juvenile court’s finding that the child was not present during the 2011 domestic-violence incident between the parents, which precipitated the child’s removal from the parents’ home, is questionable. The record shows that two DHR employees testified that the mother told them that the child had been present during that domestic-violence incident. During the trial, the juvenile court noted the mother’s inconsistent testimony regarding the child’s location during a specific instance of domestic violence. The mother testified that the father had left the child at home alone; however, the mother gave two different versions regarding the location of the child. In her first version, the mother testified:
“I came back home and I asked [the father] why you left [the child] in the *1266 house, she could have easily went down them stairs and went in the street and get hit by a car. He got mad and shoved me, punched me in my eye, punched me in my face, choked me, threw me on my glass table and started beating on me, so I called the police.... And at [the] time we had [the child]— my sister had [the child] with her at her current place. She wasn’t in the house when the incident had occurred.”
Later, when the guardian ad litem asked her about the incident, the mother testified that, when she came home, the child stood on a chair and unlocked the door for her. She then testified that the father came to the house and she began questioning him about leaving the child at home alone. When asked about the child’s location, the mother testified: “Yeah, she was staying with my sister at the time that incident had happened between me and [the father].” The guardian ad litem later noted the mother’s inconsistent testimony to the juvenile court, and the juvenile court apparently agreed:
“THE COURT: I heard that. I want to get back to what you said about— because certainly I mean, I recognize that [the mother’s] credibility—that she just lied. There was some inconsistency because even today, she said that the aunt was there or that the child was with the aunt. Then she came back when you asked her about it again to say that the child was there; that she got some kind of stool or something, stood up there and unlocked the. door, okay.”
■ In finding that the child was not present during the domestic-violence incident between the parents, the juvenile court also expressly relied on a, report of the MPD:
“[T]he facts establish that the precipitating event of domestic violence (DV) that led to [DHR’s] wrongful removal of the Minor Child from the stable home that she shared with her Parents do [sic] not support the arguments of [DHR], that the Minor Child witnessed domestic violence in her home and further that she was placed of risk of harm. The primary source of support for the claim of DHR was a DV report from the Montgomery Police Deportment (MPD). This report clearly shows that the Minor Child was not at home at the time of the domestic violence incident.”
The transcript shows that the juvenile court twice refused to admit the MPD report when it was offered by DHR at trial:
“[DHR’s attorney]: Judge, I move to admit [the MPD report] as DHR’s 19. The facts as stated in that police report, incident report, there’s no resemblance to the story that the momma told. The one that momma told, he was drunk across the street at a neighbor’s and the baby was alone. In this one, they get into it because he was texting other girls and the verbal altercation turned physical.
“THE COURT: I’m sorry. I said let me see this, but before I read this, is there an objection to the admission DHR’s 19 into the record?
[[Image here]]
“[Father’s attorney]: I have an objection, Your Honor. There’s no certificate of—from like custodian of records, anything of that nature, Judge. Haven’t been a proper predicate foundation laid for that document. There is nothing to show that it is complete and that’s everything. Not saying that DHR would take anything out, but we don’t know if there’s more to it.
“[DHR’s attorney]: [The mother’s attorney] opened the door, showed that to her client, had her client testify to that, *1267 went over the dates and what was all in there.
“THE COURT: They didn’t go over what was in there because I didn’t know and that’s why I asked to let me see it.
“[DHR’s attorney]: Multiple questions about which place. What apartment place, address and she read-the address a couple of times. [The mother’s attorney] opened that door.
“THE COURT: The objection is sustained in this regard, but I’m going to keep the document and make it part of the record.”
Later in the proceedings, when the guardian ad litem asked the mother about the MPD report, the juvenile court, without an objection, stated the following.
“THE COURT: I guess the only thing that I would say about that ... is that while the court has not read the report, but the report was not written in her voice, but it was written by someone else based upon what she allegedly told that person, for whatever that is worth.
“[The guardian ad litem]: It is an affidavit. Your Honor, and she signed it.
“[DHR’s attorney]: I don’t know that you have ruled on whether that was admitted or not, DHR’s 19.
“THE COURT: I think I did deny the admission of this document into the record based on the objection raised by [the father’s attorney], that there’s no certification of with regard to the same.
“[DHR’s attorney]: I would renew my motion to have it admitted and I would also like to point out it is a sworn affidavit by [the mother] and it doesn’t have to be a certified copy from the police report because the affiant is present.
“THE COURT: Well, the court is not going to change its ruling with regard to this matter because it is a police report. And as I indicated earlier, it is written in second voice.”
We are unable to determine how a report declared to be inadmissible by the trial court could form the basis for factual findings made in the judgment. See Montgomery Cty. Dep’t of Human Res. v. A.S.N., 206 So.3d 661, 672 (Ala.Civ.App.2016) (citing Ex parte Professional Bus. Owners Ass’n Workers’ Comp. Fund. 867 So.2d 1099, 1102 (Ala.2003)) (indicating, generally, that a court may not consider evidence that was determined to be inadmissible). However, DHR has not asserted that the juvenile court’s, improper reliance on the MPD report or the juvenile court’s determination that the child was not present during the incident is reversible error. Our supreme court has held that “a party seeking reversal on appeal must not only argue a valid ground of reversible error committed below, but must also have preserved that error for review by proper procedural mechanisms.” Ex parte, O’Leary, 417 So.2d 232, 240 (Ala.1982). See also East v. Citrano, 49 Ala.App. 371, 373, 272 So.2d 680, 582 (Civ.App. 1973) (holding that “[assignments of error not substantially argued must be considered as waived”).
As explained above,”[i]n order for the juvenile court to make a finding that a child is dependent in a case involving termination of parental rights, the juvenile court must first determine by clear and convincing evidence that grounds for termination of parental rights exist.” Talladega Cty. Dep’t of Human Res. v. J.J., 187 So.3d 705, 711 (Ala.Civ.App.2015) (cit ing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)).
The juvenile court found that DHR did not prove by clear and convincing evidence that grounds for termination existed. In addition to that determination, the juvenile court expressed multiple times throughout *1268 its judgment that the child had been wrongfully removed from the parents’ home and that the parents remained willing to parent the child, which could indicate that the juvenile court determined that the child is not dependent. Nevertheless, the juvenile court did not return custody to the parents but instead ordered the continuation of state involvement by mandating that DHR “immediately begin reunification efforts with [the parents]. The reunification efforts must be implemented in a good faith manner. Hereafter, this matter shall be set for monthly review.” No argument is made on appeal that the juvenile court’s judgment is inconsistent, and “[i]t is not the duty of the appellate court to make arguments for the parties.... ” Woods v. Federated Mut. Ins. Co., 31 So.3d 701, 706 (Ala.Civ.App.2009).
As noted, the record contains evidence presented by DHR that, if believed, would clearly and convincingly establish that the child is dependent and that the best interests of the child would be served by a termination of parental rights. But we cannot assess the credibility of witnesses, for it is the sole province of the juvenile court as the trier of fact to believe or disbelieve testimony and assign the weight to give to the credible testimony. Although we might have reached a different result, we must affirm the juvenile court’s judgment if there is credible evidence to support it. See Griggs, 638 So.2d at 918-19. Based on the foregoing, the judgment of the juvenile court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., concurs in the result, with writing.

. It is not clear from the record whether the mother has a total of four or five children. However, at least three other children were removed from the mother's custody and placed with relatives based on the mother’s inability to properly care for those children.

. It is not clear from the record whether the juvenile court was involved in placing the child with the maternal grandmother.

. FOCUS employees testified that FOCUS assesses families to determine what reunificátion or family-preservation services can be offered.