DONALDSON, Judge.
The Montgomery County Department of Human Resources ("DHR") appeals from a judgment of the Montgomery Juvenile Court ("the juvenile court"), entered in three separate actions, declining to terminate the parental rights of O.W. ("the mother") and the alleged fathers of three children. At the time of the termination-of-parental-rights trial, the oldest child had been in foster care for 6 years, the middle child had been in foster care for almost 2 years, and the youngest child had been in foster care for 11 months-his entire life. Uncontradicted evidence established that the children were dependent, that the alleged fathers had abandoned the children, and that the mother was unwilling or unable to discharge her parental responsibilities. The record does not support the judgment of the juvenile court; to the contrary, the only legally correct conclusion that could have been reached based on the evidence presented to the juvenile court was to terminate the parental rights of the mother and the alleged fathers. See Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d 661 (Ala. Civ. App. 2016) (holding that a juvenile court's decision not to terminate parental rights was unsupported by the record). Therefore, we reverse the judgment.
*224 Facts and Procedural History
DHR had an extensive history with S.D., the mother's mother, based on reports of child abuse related to the mother and her siblings. The mother gave birth to M.R. ("the oldest child") on March 15, 2010, when she was 15 years old. In 2011, DHR became involved with the mother and the oldest child, when the mother was 16 years old. The mother had been living in a home with her 18-year-old brother, her 17-year-old sister, and her sister's three young children for approximately one year, since S.D. had been incarcerated for child-abuse charges. The mother had no income, and she had not been obtaining medical care for the oldest child. In April 2011, the juvenile court issued a pickup order for the mother and the oldest child and placed them in the temporary legal custody of DHR. The mother and the oldest child had multiple foster-care placements together until the mother left foster care in May 2014, at age 19, with the oldest child. Two days later, the mother returned the oldest child to DHR, but the mother refused to reenter foster care. The oldest child had remained in foster care since that time. DHR was relieved of custody of the mother in September 2014.
M.W. ("the middle child") was born on November 16, 2014. When the middle child was born, the mother had obtained a place to live and DHR permitted the mother to take the middle child home from the hospital with her. DHR then arranged for the mother to have supervised in-home visitation with the oldest child. After three months, DHR allowed the mother to have unsupervised in-home visitation for two to three hours and, sometimes, half a day. The mother's visitation with the oldest child transitioned into overnight and weekend visitation. At that point, the mother reported to DHR that various people had been staying at her house. Those individuals would not cooperate with DHR to obtain DHR's permission to be around the mother's children. In response, DHR moved the mother into an apartment complex and provided the mother's deposit and rent for the first month. DHR then placed the oldest child back in the home with the mother and the middle child.
Shortly thereafter, as a result of the oldest child's missing school and medical appointments and the mother's not having working utilities in her home, DHR removed both the oldest child and the middle child from the mother's custody and placed them in the home of Y.R. ("the foster mother"). In January 2016, the juvenile court found the middle child to be dependent.
On March 22, 2016, S.W. ("the youngest child") was born. The youngest child was found to be dependent two days after his birth and was placed with the foster mother and his siblings. DHR permitted the mother to have additional visitation with the youngest child to facilitate bonding between them. The mother had in-home visitation with the youngest child three days per week for multiple hours at a time. That arrangement lasted only one month, however, because the mother was unable to pay for her utilities and had no electrical power in her home. DHR paid for the mother's utilities and helped her catch up on her unpaid rent, which she had not paid for two months. Visitation between the mother and all three children recommenced at DHR's office, and, over time, the visitations again transitioned into in-home visitation. Before the mother was able to transition to overnight visitation, however, the mother was evicted from her apartment and became homeless.
The mother began staying with a friend in a house. After DHR approved the friend and the house, DHR reinstated in-home visitation for the mother with the oldest *225 child and the middle child. After the mother had had one visitation with the children in the house, the mother's friend moved. The mother again had no place to live, and the location of the mother's visitation with the children returned to DHR's office.
Around June 2016, the mother moved in with another friend in another home. DHR again approved the mother's friend and the home and reinstated in-home visitation for the mother and the children. It was undisputed that the mother was not consistent with visitation during that time. Testimony indicated that, on more than one occasion, the DHR case aide assigned to the children brought the children for in-home visitation but the mother was not at the home.
In June 2016, DHR filed a separate petition to terminate the rights of the mother and of A.S., an alleged father, to each child. DHR noted in the petitions that paternity had not been established for the children.
In July 2016, the mother moved to Auburn to live with a friend. Within two weeks, DHR had approved the mother's friend and her home in Auburn and had approved in-home visitation for the mother. When DHR attempted to begin the visitation, however, the mother reported that she had a problem with her friend's boyfriend and believed that it was not a good idea to have visitation with the children at that home. In response, DHR began transporting the children to a restaurant in Auburn for the mother to exercise visitation, which lasted approximately one month. On a day the mother was supposed to have visitation in Auburn, the mother asked if she could instead visit with the children in Montgomery. DHR agreed, but the mother did not contact the foster mother as she had agreed to do.
Between July and October 2016, the mother lived in three different places in either Auburn or Opelika. In October 2016, the mother moved back to Montgomery. DHR reinstated visitation to be held at DHR's office; however, the mother did not visit with the children between June 2016 and November 2016. In November 2016, the mother visited with the children when the foster mother invited her to celebrate Thanksgiving.
In December 2016, DHR moved to amend the petition it had filed to terminate the mother's parental rights to the middle child to add B.P. as an additional alleged father of the middle child, and DHR sought to have B.P. undergo paternity testing. The juvenile court denied DHR's motions. DHR then filed a motion to serve alleged fathers A.S. and B.P. and any unknown fathers by publication pursuant to § 12-15-318, Ala. Code 1975, which was granted.[1]
On March 6, 2017, the juvenile court held a termination-of-parental-rights trial. At the beginning of the trial, the juvenile-court judge met with the attorneys. The attorney for the mother told the juvenile court that the mother had decided not to attend the trial and had instead decided to voluntarily consent to the termination of her parental rights.
At the time of the trial, the mother was 21 years old, the oldest child was 6 years old, the middle child was almost 2 years old, and the youngest child was 11 months old. The foster mother testified that she had had custody of the oldest child for almost two years, of the middle child for *226 one year, and of the youngest child for almost one year-since his birth. The foster mother testified that the oldest child had been having conduct issues at school recently, that the middle child had begun fighting with other children at a day-care facility, and that the youngest child suffers from "twisted bowels" and milk intolerance and that his medical conditions required multiple medical appointments. The foster mother testified that the youngest child will continue to need medical care regarding his bowel condition.
The foster mother testified that, at the time of the termination trial, the mother had seen the children only three times since the previous summer-once in August 2016, once in November 2016, and once in January 2017. The foster mother testified that the mother never contacts the children by telephone but that she had sent the foster mother messages on Facebook, a social-networking Web site, to ask about the children. The foster mother testified that she had invited the mother to celebrate Thanksgiving in 2016 with the children at the foster mother's home and that the mother had visited with the children at that time.
The foster mother testified that the permanency plan for all three children was adoption by her and her husband. The foster mother testified that she and her husband wished to adopt the children "to give them a better life, stability." The foster mother further testified that she had discussed adopting the children with the mother and that, if the mother wanted to maintain contact with the children after the proposed adoption, the foster mother would allow it. The foster mother testified that she and her husband are both employed and that the children would be covered on her husband's health-insurance policy if they are adopted. In response to questioning by the juvenile court, the foster mother testified that she and her husband receive approximately $400 each month as a subsidy for fostering each child, and she believed that the subsidy would continue after the children were adopted, although she was not sure.
Zenene McCullough, a foster-care worker for DHR, testified that she had been the oldest child's and the middle child's foster-care worker for over two years and the youngest child's foster-care worker since his birth. McCullough testified that paternity had not been established for any of the children. McCullough testified that the mother had named F.R. as an alleged father for the oldest child and, initially, had named F.R. as the father of the middle child. F.R., however, had been incarcerated in a facility operated by the Alabama Department of Corrections since 2010 and, thus, could not have been the middle child's father.[2] The record includes results from a DNA paternity test that excluded F.R. as the father of the oldest child.
McCullough testified that B.P. was named as a possible father of the middle child. McCullough testified that she had spoken with B.P., had notified him of the ongoing proceedings and of the termination trial, and had asked him to submit to paternity testing. McCullough testified that B.P. had initially agreed to testing but had since refused to answer or return McCullough's telephone calls.
McCullough testified that J.B. was named as a possible father for the youngest child but that she had been unable to *227 locate him.[3] A family friend provided McCullough with the name of A.S. as an alleged father, and the mother informed McCullough that he was the alleged father of all the children. McCullough conducted a search on the putative-father registry, and A.S. was listed as a putative father of all three children. McCullough testified that she was unable to locate A.S., or any other alleged father, despite her efforts, which, she testified, included
"child support referral, food assistance checks, Facebook, white pages, requesting information from the mother, went to look for the addresses provided by [the mother], unable to locate, sent 5 certified letters to addresses provided by child support and [the mother], [which] came back unclaimed, sent every possible combination of addresses given by [the mother], [conducted a] local jail search [and] Department of Corrections search, and [completed a] food assistance inquiry on [A.S.'s] mom and dad."
McCullough also testified to the numerous attempts DHR had made to locate relative resources for the children. McCullough contacted R.D., the children's maternal grandfather who lived in Ohio, and, although they were willing to provide financial assistance to the mother, he and his wife were not willing to accept custody of the children. McCullough testified that the children's maternal grandmother was not a potential relative resource because she had a history of abuse and neglect investigations with DHR, her children had been removed from her home, and she had been convicted of a felony. McCullough testified that she had considered the mother's sisters but that they too had had their children removed from their custody. As a result, the mother's sisters were not potential placements for the children. McCullough testified that she also considered the mother's brothers but that they had been unwilling to cooperate with DHR's efforts to investigate their suitability. McCullough testified that she was not aware of any other maternal relatives and that the mother had not provided DHR with any additional relatives for consideration. McCullough testified that she had also considered at least five of the mother's friends as potential placements for the children but that none had been willing to accept custody of the children.
McCullough testified that the mother's Individualized Service Plan ("ISP") goals were to maintain a safe and stable home for the children, to maintain employment, to maintain consistent visitation, to maintain consistency with in-home services she was provided, to attend therapy for her mental health, and to complete a parental-capacity assessment and any counseling or treatment recommended by that assessment.
McCullough testified that the mother had completed a parental-capacity assessment, after DHR's second request. The record shows that a psychological evaluation/parental-capacity assessment that recommended counseling and parenting classes for the mother was completed in May 2016. The mother had not completed any of those recommendations at the time of the trial.
McCullough testified that the mother had attended one counseling session but that she had refused to return because she did not like the counselor. In response, DHR referred the mother to a different counselor, but the mother was inconsistent in attending counseling sessions. The *228 mother never attended mental-health therapy sessions as DHR had requested. McCullough also testified that the mother never attended parenting classes, even though DHR had referred her to them.
McCullough testified that DHR had referred the mother to an organization that provided in-home services to achieve reunification with the children. According to McCullough, that organization provided in-home services twice per week that focused on "[g]eneral parenting skills, protective capacities, safe and age appropriate discipline, improved decision making, knowledge of client's daily educational and developmental needs, home management skills, includ[ing] budgeting and establishment of daily structure, and effective communication skills and appropriate boundaries to improve relationships." McCullough testified that the organization also provided employment assistance by assisting in the completion of resumes and applications, developing interview skills, and providing transportation related to employment searches. The organization also observed visitation to assess the parent-child interaction. According to McCullough, that organization terminated its services in August 2016 based on the mother's inconsistencies "[d]uring service provision and participation .... Participation was cyclic in nature with periods of engagement followed by more frequent periods of unavailability for sessions and failure to maintain contact with [the organization]."
McCullough testified that DHR had also referred the mother to the local housing authority and to "Transformation Montgomery" for assistance in finding housing and that DHR had provided the mother with employment assistance, financial assistance for utilities and food, and free transportation and day care for the children. McCullough testified that she had bought groceries and meals for the mother with her own money in an effort to assist her. Despite DHR's efforts, the mother did not utilize the assistance offered. McCullough further testified that the mother "tends to withdraw when there are issues [rather than] problem solving or trying to reach out for help." McCullough testified that she did not know where the mother had been living since she moved back to Montgomery in October 2016.
McCullough testified that the mother had bought the children one gift in two years and that she had not paid any financial support to the foster parents. According to McCullough, the mother had been served with a child-support-arrearage assessment of $3,470 for one child, but she had not been served with notices of arrearage for the other two children because DHR had been unable to locate the mother.
McCullough testified that, throughout the time DHR had worked with the mother, the mother had often been untruthful with DHR and had not maintained contact with DHR. McCullough testified that the mother had worked "very little" during the pendency of the cases and that the mother had not provided verification of her employment as requested. McCullough testified that DHR had provided employment listings to the mother, and had reached out when it became aware of potential employment opportunities, and that the children's guardian ad litem and the mother's attorney had also attempted to help the mother obtain employment. McCullough further opined:
"What I have seen change since I have been on the case is that it seems like [the mother] gave up on parenting. It's almost, like, at one point when she was-when we were doing visits, consistently working towards reunification really hard, then it is like now and *229 months-back up to, like, when she was-she started moving around a lot, it is, like, if I don't make the effort to reach out, it is, like, it is almost like she has given up. When she was around the kids, I have no concern with that. It is just being consistent and getting them and working on what we are working on.... It's her commitment and consistency that actually dwindled instead of stepped up...."
McCullough testified that once the mother stopped visiting the children on a consistent basis the oldest child began having behavioral issues in school and had been suspended. The oldest child was taken to a doctor who believed she was showing signs of attention-deficit/hyperactivity disorder ("ADHD"). DHR referred the oldest child for a full evaluation, and she was prescribed a medication for ADHD. Afterward, the oldest child's issues seemed to have resolved.
McCullough testified that the middle child had had some behavioral issues at day care, but McCullough did not believe that the issues were any different from what other two-year-old children would have.
McCullough testified that the youngest child had been diagnosed with Hirschsprung's disease, which she described as a birth defect involving the large intestine that causes problems with digestion. McCullough explained that the youngest child had had multiple visits in Birmingham related to his medical condition, and she testified that the mother lacked the funds, transportation, and resources necessary to care for the youngest child's medical needs.
According to McCullough, the mother was not consistent in visiting the children, especially when the visitation was scheduled to occur at DHR's office. McCullough testified that the mother has an emotional bond with the oldest child, but not as much of a bond with the middle child, and no bond with the youngest child. McCullough opined that the mother's parental rights should be terminated to provide permanency for the children. McCullough testified that the oldest child looks forward to every Thursday-the day the mother is supposed to exercise visitation-but that the mother had not been visiting as scheduled. McCullough testified that, if termination occurred, the oldest child (and the other children) would no longer have to worry about the mother not showing up for visitation. McCullough testified that the children have "definitely" bonded with the foster mother.
On March 15, 2017, after the trial, the mother filed a motion through counsel in which she asserted that the facts in a proposed order submitted by DHR to terminate her parental rights were accurate, that the proposed order terminating her parental rights was in the best interest of both the mother and the children, and that she supported DHR's proposed order. A copy of DHR's proposed order is not contained in the record. Also on March 15, 2017, counsel for A.S. filed a notice detailing her unsuccessful efforts to locate A.S. and other alleged fathers.
On April 5, 2017, the juvenile court entered the following judgment in which it declined to terminate parental rights:
"This cause having come before the Court upon the petitions for Termination of Parental Rights filed by [DHR]. Present before the Court on March 6, 2017 were the Guardian ad Litem, the Honorable Guy Holton; the Honorable Juliana Taylor, attorney for the Mother of the above named Minor Children; the Honorable Larry Sasser, attorney for the alleged father of [the oldest child]; the Honorable Preston Presley, attorney for the alleged father *230 of [the middle child]; Zenene McCullough and Brad Ellis, both with DHR; and [Y.R.], foster mother. Neither the Mother, [O.W.], nor any alleged/unknown Father of the Minor Children appeared.
"Domestic violence, drugs and major mental health issues are seen with some frequency as the identified reasons for removal of children from their homes. In the instant action neither of these issues present as the basis for removal. Rather, it appears that issues such as poverty, unstable family and home life and education or the lack thereof along with youthful indiscretions are the root causes leading to this proposed termination. It appears that by age 16 (approximately), the Mother's world began to crumble when she witnessed her mother stab her paramour and was subsequently arrested and incarcerated leaving behind three Minor Children who lived on their own in the absence of both their Mother and Father. Further, before turning 19 (approximately), this Mother predictably became a Mother for the first time followed by the birth of two other children prior to the filing of the TPR [termination-of-parental rights] Petition. The Mother did not complete her high school education, but was subsequently forced to secure employment that did not allow her to earn a living wage and/or the ability to provide stable housing for herself and her three children. The record shows that the Mother worked and sometimes worked two jobs in an effort to make ends meet. She would later secure her GED at a community college and may in fact be pursuing higher education. Her lawyer and others testified that she is smart. The court also notes that she attended most Individualized Service Plan (ISP) meetings. Per my records, the Mother only missed two ISP meetings. She also attended court hearings. The court recalls that she missed approximately two hearings. The Mother made a positive impression.
"On the day of hearing on the Petition for Termination of Parental Rights, the Mother failed to appear, to the surprise of the court given the Mother's past history of attendance. The court was surprised that the Mother would miss the most important hearing. Her lawyer advised the court that it was likely she would not appear, as the lawyer advised the Mother that if she did not challenge DHR on the TPR petition or voluntarily relinquished her parental rights that DHR could not hold it against her in any future TPR proceeding. Counsel further advised the court that she advised her client in this manner as this is the law. However, no law was presented to the court in support of this representation and the court has been unable to find this law. Further, counsel for the Mother represented to the court the Mother intended to waive her parental rights. However, the same was not reduced to writing. Following the TPR hearing, counsel for the Mother filed with the clerk's office notice that the Mother supports DHR's TPR Petition. However, the court notes that the notice did not include the handwritten signature of the Mother although it is apparent the lawyer and Mother communicated with each other following the TPR hearing. It appears to the court that the lawyer has the trust of her client. However, the court is of the opinion that the foregoing is not clear and convincing evidence, competent, material and relevant in nature to terminate parental rights. Ordinarily, the court may have been inclined to surmise that a parent's failure to appear at a TPR hearing spoke to their commitment. However, in the instant action *231 the court is unsure of this given the lawyer's representations. Additionally, based on this court's experience with TPR hearings, I now know that parents do not challenge TPR petitions for various reasons, including the lack of financial resources to afford housing and other resources to parent their children. This court notes in the past that this mother ran with her child and on another occasion failed to communicate with DHR as she expressed her opinion that it was likely that her child or children would be taken from her by DHR. This behavior does not appear to be indicative of someone who does not desire to parent. Further, if the court accepts as true that the Mother's absence is her concern for future DHR encounters, it likewise does not seem to suggest that the Mother is someone who does not desire to parent her child or future children. The court also is of the opinion that the representation that the foster mother will allow the Mother to communicate and visit with the children, as she has done in the past, if she wants to is also indicative of this court's position that clear and convincing evidence, competent, material and relevant in nature, has not been presented to the court. It appears that Code of Alabama, Section 12-15-314 provides an avenue for the court to work with the Mother as there appears to be more to work with than not, particularly as to the younger two children, as it is not clear to the court that the last two children were in care for the requisite period of time at the time that the TPR petition was filed. Based on the foregoing, this court is of the opinion that the Mother's parental rights should not be terminated, as [DHR] should work closely with the Mother to establish stable housing, to include public housing. It concerns the court greatly that the Mother did not take advantage of her opportunities with DHR when she was age eligible. Perhaps, DHR could have then done more to establish the desired stability. The Mother appears to have always lacked a stable foundation. Notwithstanding the same, poverty should not be the basis for termination of parental rights.
"This case also is representatives of many of my DHR cases where alleged Fathers and unknown Fathers are not afforded the same opportunities to parent their children as Mothers. These Fathers are often not identified by the Mothers or their families, for various reasons. Also, seemingly, our culture tends to be more supportive of the Mother-Child relationship. It appears that the same effort is not made to find Fathers. As in this action, effort is often made later rather than sooner to either identify, locate and/or involve Fathers in the DHR process. The court acknowledges that resources are limited, but do[es] not find that this is good reason to forfeit the parental rights of Fathers. The court reviewed the ISPs for the alleged Father. It included representations as if DHR had indeed 'worked' with the father, when DHR clearly had not. This court is also concerned that the Mother did not help things when she was not candid about past relationships and thus delayed the process, particularly so when deadlines were looming. Paternal relative resources might have been viable options. It also is not helpful that DHR's efforts do not appear to be intense relative to fathers when DHR has access to the Mother and/or her family. This is not good for Children and Families.
"It appears to the court that the failure to identify, locate and/or involve Fathers is further complicated by the newspaper publication requirement.
*232 While this court understands the value of permanency, it notes that newspaper publication makes it easier to proceed forward quickly with findings of dependency and termination, when it does not appear that good faith efforts have been made to identify Fathers. This court acknowledges that she approved the Motion for Newspaper Publication, but notes that the same did not even include the name of the Mother to firmly establish who [were] the Parties in question involved. In the instant action, service was perfected through newspaper publication. In accordance with Code of Alabama 1975, Section 12-15-318(c)(2) a petitioner shall request service by publication if service of process has not been completed within 45 days of filing of the termination of parental rights petition. The undersigned is concerned that publication in the Montgomery Independent is not a publication in a newspaper of 'general circulation.' The court cannot speak to the readership of the Montgomery Independent, but is of the opinion that it is unlikely that the average Montgomery County reader is reviewing legal notices in the Montgomery Independent and is less likely to actually be provided notice in accordance with due process requirements. The oldest child in this case came into care in 2011. It was only after the TPR hearing had concluded that this court received the results of the paternity test for one alleged father who was excluded as the Father of the minor child in question. Given these facts, there was no opportunity to seek out a potential father who may have been willing and able to parent the child or children in question.
"For the foregoing reasons, this court does not believe that clear and convincing evidence, competent, material, and relevant in nature, has been presented to the court in support of the Petition for Termination of Parental Rights for the alleged and/or unknown Fathers. Thus, the Petition for Termination of Parental Rights is Dismissed for failure of proof.
"Lastly, these cases are complex as courts are called upon to balance the rights of parents and children, particularly when there is a representation that a foster parent has expressed an interest in adopting the child/children. It would please this court greatly to achieve stability sooner rather than later. However, this court is compelled to follow the law and apply the evidence to the law."
On April 18, 2017, DHR timely filed a motion to alter, amend, or vacate the judgment, which had been entered in each child's case. On April 24, 2017, the mother, through counsel, filed a "Notice of Revocation of Consent" in which she asserted she is able and willing to care for the children and that she wished to withdraw her consent to the termination of her parental rights.[4]
On May 1, 2017, the juvenile court entered an order denying DHR's motion to alter, amend, or vacate the judgment. On May 2, 2017, DHR timely filed notices of appeal to this court. This court has consolidated the appeals. After DHR filed its appellate brief, the mother's counsel filed a motion in this court in which she asked that the appeals be submitted solely on DHR's brief. In the motion, the mother's counsel stated:
*233 "1. That the mother has consulted with the undersigned at length and over a period of time since the filing of the notice of appeal and has been informed of her options in this cause.
"2. That the mother has reviewed the record and has been informed of the progress of this appeal.
"3. That the mother has advised undersigned that she understands her options.
"4. That the mother is satisfied that the matter be submitted on brief from the Department of Human Resources."
Discussion
On appeal, DHR argues that the juvenile court wrongfully denied its petitions to terminate the mother's and the alleged fathers' parental rights because, it asserts, it proved that grounds for termination existed, that no viable alternatives existed, and that it was in the children's best interests for termination to occur.
Pursuant to § 12-15-319(a), Ala. Code 1975, a juvenile court may terminate a parent's rights if it finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child or that the parent's conduct or condition renders that parent unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future. In determining whether to terminate a parent's rights, the juvenile court shall consider, among other things:
"(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"....
"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"....
"(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
"(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
"(11) Failure by the parents to maintain consistent contact or communication with the child.
"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
In determining whether to terminate the parents' rights to the children, "[the] juvenile court [was] required to apply a two-pronged test ...: (1) clear and convincing evidence must support a finding that the child[ren are] dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights." B.M. v. State, 895 So.2d 319, 331 (Ala. Civ. App. 2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala. 1990) ). This court has further explained that
"appellate courts must apply a presumption of correctness in favor of the juvenile court's findings in a termination-of-parental-rights action. J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala. Civ. App. 2007). 'Additionally, we will reverse a juvenile court's judgment *234 terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence.' Id. See Ex parte McInish, 47 So.3d 767, 774 (Ala. 2008) (explaining standard of review of judgment resting upon factual determinations required to be based on clear and convincing evidence)."
S.S. v. Calhoun Cty. Dep't of Human Res., 212 So.3d 940, 949 (Ala. Civ. App. 2016). "This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So.3d 650, 653 (Ala. Civ. App. 2016) (citing Ex parte T.V., 971 So.2d 1, 9 (Ala. 2007) ). "When [the juvenile court's] findings rest on ore tenus evidence, this court presumes their correctness." Id."Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence." K.P. v. Etowah Cty. Dep't of Human Res., 43 So.3d 602, 605 (Ala. Civ. App. 2010) (citing D.M. v. Walker Cty. Dep't of Human Res., 919 So.2d 1197, 1210 (Ala. Civ. App. 2005) ).
I. The Alleged Fathers' Parental Rights
DHR argues that the alleged fathers abandoned the children. "Abandonment" is defined as
"[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
§ 12-15-301(1), Ala. Code 1975. Because the juvenile court did "not explicitly address the issue of abandonment in its judgment[, w]e must ... assume that the juvenile court made those findings necessary to support a determination that the parents did not abandon the child, unless that finding is unsupported by the evidence." Montgomery Cty. Dep't of Human Res. v. T.S., 218 So.3d 1252, 1262 (Ala. Civ. App. 2016) (citing Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996) ).
The undisputed evidence indicated that the alleged fathers had never had any contact with the children and had failed "to claim the rights of a parent." § 12-15-301(1). All the alleged fathers were represented by counsel. The record shows that F.R. was not the biological father of the oldest child as had once been asserted. B.P. was aware of the proceedings but refused to participate or otherwise assert his rights. DHR was unable to establish contact with J.B. and A.S. Although DHR had been unable to contact A.S., he was listed as a putative father of all three children on the putative-father registry. The evidence establishes that the alleged fathers have withheld from the children for the entirety of their lives their " 'presence, care, love, protection, maintenance, or the opportunity for the display of filial affection.' " Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d at 671 (quoting § 12-15-301(1), Ala. Code 1975 ). Undisputed clear and convincing evidence supports a finding that A.S., B.P., and J.B. abandoned the children. "Pursuant to § 12-15-319(b), Ala. Code 1975, abandonment that continues for a period of four months gives rise to a rebuttable presumption that the parents are unable or unwilling to act as parents." Montgomery Cty. Dep't of Human Res. v. T.S., 218 So.3d at 1262.
*235 The juvenile court specifically found that "DHR's efforts do not appear to be intense relative to fathers when DHR has access to the Mother and/or her family." We first note that that finding is not supported by the evidence in the record. McCullough testified to extensive efforts made to locate and to provide services to the alleged fathers. The attorney for A.S. also submitted documentation detailing her efforts to locate A.S. and other alleged fathers. We also note that, pursuant to § 12-15-312(c)(1)d., reasonable efforts are not required when a parent has abandoned "an infant or young child when the identity of the child is unknown and the parent is unknown or unable to be located after a diligent search." Further, " '[b]y abandoning [his] child, [the father] "lost any due-process rights that would have required the juvenile court to explore other alternatives before terminating [his] parental rights." ' " T.T. v. C.E., 204 So.3d 436, 439 (Ala. Civ. App. 2016) (quoting L.L. v. J.W., 195 So.3d 269, 274 (Ala. Civ. App. 2015), quoting in turn C.C. v. L.J., 176 So.3d 208, 217 (Ala. Civ. App. 2015) ). Accordingly, the juvenile court's judgment declining to terminate the parental rights of the alleged fathers is not supported by the evidence in the record and must be reversed.
II. The Mother's Parental Rights
DHR also argues that the juvenile court erred in failing to terminate the mother's parental rights. In its judgment, the juvenile court found that, despite the mother's communication through her counsel that she wished to consent to termination and supported DHR's petitions to terminate her parental rights, the fact that the mother had not reduced her consent to writing and did not personally sign her notice in support of DHR's petitions, coupled with the mother's past behaviors, was not "indicative of someone who does not desire to parent."
DHR challenges the juvenile court's determination that it did not make reasonable efforts to reunite the mother and the children. The juvenile court, in stating that "there appears to be more to work with than not" in regard to the mother and that DHR "should work closely with the Mother to establish stable housing," implicitly found that DHR had failed to make reasonable efforts to rehabilitate the mother. This finding, however, is not supported by the evidence in the record. It was undisputed that DHR referred the mother to two organizations for the purpose of obtaining housing and that DHR provided financial assistance for housing and utilities on more than one occasion. DHR also offered the mother free day care for the children, transportation assistance through bus passes and case aides, employment assistance, counseling, and parenting classes. It was also undisputed that, despite DHR's offering those numerous services, the mother did not maintain a stable home, did not maintain steady employment, did not attend parenting classes, did not complete counseling, and did not utilize the transportation and day care services offered. "A parent's failure to avail themselves of the services provided to them should be considered when evaluating whether rehabilitation of the parents should continue or is failing." Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d at 672 (citing A.M.F. v. Tuscaloosa Cty. Dep't of Human Res., 75 So.3d 1206, 1212 (Ala. Civ. App. 2011) ). As we have previously held, it appears that, in this case,
"the juvenile court seeks to impose on DHR a Herculean duty to do absolutely everything for a parent facing termination of his or her parental rights while imposing no duty on that same parent to make efforts to change the conduct, condition, or circumstance that *236 gave rise to his or her child's dependency. This is an incorrect view of the principles underlying DHR's duty to make reasonable efforts to rehabilitate parents whose children have been removed from their custody."
Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d at 673. Clear and convincing evidence in the record supports a finding that DHR employed reasonable efforts aimed at rehabilitating the mother and reuniting the family and that those efforts failed. § 12-15-319(a)(7).
DHR next argues that clear and convincing evidence demonstrated that the mother had failed "to provide for the material needs of the child[ren] or to pay a reasonable portion of support of the child[ren]" despite having sporadic employment. § 12-15-319(a)(9). The undisputed evidence indicated that the mother had provided one gift for the children in a two-year period and that the mother had not paid any financial support for the children since they had been in foster care.
DHR also argues that clear and convincing evidence demonstrated that the mother had failed to maintain regular visitation with the children and had failed to maintain consistent contact or communication with the children. See § 12-15-319(a)(10) and (11). The undisputed evidence indicated that the mother had cyclic patterns where her visitation changed from supervised to in-home extended visitation. Despite that progress, however, the mother exercised visitation with the children on only three occasions between June 2016 and January 2017. McCullough testified that the mother had been inconsistent with visitation and contact with the children and that she believed the inconsistency had begun affecting the oldest child's behavior. The foster mother testified that the mother had seen the children only in August 2016, November 2016, and January 2017, and that the only reason the mother visited with the children in November was because the foster mother had initiated the visitation.
DHR also argues that clear and convincing evidence supported a finding, pursuant to § 12-15-319(a)(12), that the mother had failed to adjust her circumstances to meet the needs of the children and had failed to accomplish goals established in ISP meetings. DHR asserts that the mother's failure to progress despite having had years to address her parenting deficiencies and housing situation and the lack of evidence to indicate that the mother's circumstances would change in the foreseeable future support a termination of the mother's parental rights.
The evidence demonstrated that the mother lacked stable housing and stable employment and that she lacked the resources necessary to obtain medical treatment for the youngest child. As explained above, although DHR offered numerous services tailored to the mother's needs, the mother failed to avail herself of much of the assistance offered to her by DHR.
"A parent must take advantage of services offered to him or her and must take personal responsibility for his or her shortcomings and make actual efforts aimed at improving his or her circumstances. A parent's failure to do so supports the conclusion that the parent has failed to adjust his or her circumstances to meet the needs of his or her child."
Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d at 673-74. DHR presented clear and convincing evidence to satisfy multiple grounds in support of termination of the mother's parental rights.
*237 III. Viable Alternatives
DHR also argues that it proved that no viable alternatives to termination existed. Because the juvenile court did not expressly find the existence of viable alternatives, we must assume that the juvenile court made those findings necessary to support its judgment, unless such findings are clearly erroneous. Ex parte Roberts, 796 So.2d 349, 352 (Ala. 2001). This court has stated that,
"[a]lthough DHR has a responsibility to investigate alternate relative placements for a child, that obligation does not entirely alleviate the responsibility of the parent who purports to oppose the termination of his or her parental rights of making DHR social workers aware of alternative placement possibilities."
B.S. v. Cullman Cty. Dep't of Human Res., 865 So.2d 1188, 1197 (Ala. Civ. App. 2003). The evidence indicated that the mother provided DHR with a blank relative-resource form on at least one occasion. McCullough, through her own efforts, explored multiple relatives and nonrelatives as potential resources and custody placements for the children. All of those potential placements were either unwilling to accept custody or were deemed unsuitable for placement of custody.
To the extent the juvenile court believed that continuing to leave the children in foster care until the mother was able to rehabilitate herself was a viable alternative,
"[t]his court has held that leaving a child in foster care when the parent ... is not progressing toward reunification is not a viable alternative to the termination of parental rights. T.G. v. Houston County Dep't of Human Res., 39 So.3d 1146, 1152-53 (Ala. Civ. App. 2009) ; R.L.B. v. Morgan County Dep't of Human Res., 805 So.2d 721, 725 (Ala. Civ. App. 2001). This court has rejected 'maintain[ing] the children in foster care until, perhaps, the mother could rehabilitate herself sufficiently to become a fit mother' when the court concluded that the possibility of such rehabilitation was 'remote.' S.B. v. State Dep't of Human Res., 743 So.2d 470, 472 (Ala. Civ. App. 1999)."
Jefferson Cty. Dep't of Human Res. v. L.S., 60 So.3d 308, 315-16 (Ala. Civ. App. 2010). This court has "long held that a parent's good-faith efforts to change his or her circumstances must come to fruition in a timely manner or a child's need for permanency will outweigh those efforts, stating that, '[a]t some point, ... [a] child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent.' " Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d at 674 (quoting M.W. v. Houston Cty. Dep't of Human Res., 773 So.2d 484, 487 (Ala. Civ. App. 2000) ).
As noted, at the time of the termination-of-parental-rights trial, the oldest child had been in foster care for 6 years, the middle child had been in foster care for almost 2 years, and the youngest child had been in foster care for 11 months-his entire life. Ultimately, "the paramount concern in [termination] proceedings is the child's best interests." J.V. v. State Dep't of Human Res., 656 So.2d 1234, 1235 (Ala. Civ. App. 1995). The mother has proven through her actions that she is unable or unwilling to discharge her parental responsibilities for the children, who had remained in foster care for the majority of their lives. The children "deserve permanency." Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d at 674. In light of the evidence in support of DHR's petitions, we have no alternative but to conclude that the juvenile court exceeded its discretion *238 in denying DHR's petitions to terminate the mother's parental rights.
Conclusion
DHR provided undisputed and uncontroverted evidence that satisfied multiple factors in § 12-15-319(a) and clearly and convincingly demonstrated that the mother and the alleged fathers are unable or unwilling to discharge their parental responsibilities to and for the children and that the mother's and alleged fathers' conduct or conditions are unlikely to change in the foreseeable future. Accordingly, the juvenile court's judgment is reversed, and the causes are remanded with instructions that the juvenile court enter a judgment terminating the parental rights of the mother and the alleged fathers to the children.
2160617-REVERSED AND REMANDED WITH INSTRUCTIONS.
2160618-REVERSED AND REMANDED WITH INSTRUCTIONS.
2160619-REVERSED AND REMANDED WITH INSTRUCTIONS.
Thompson, P.J., and Pittman, Thomas, and Moore, JJ., concur.

Although, in the judgment, the juvenile-court judge criticizes DHR's service on the alleged fathers by publication, the alleged fathers, who were represented by counsel, did not challenge the sufficiency of the service by publication and have not filed a brief on appeal.

The attorney for F.R., the alleged father of the oldest child, stated before the trial that F.R. was initially named by the mother, but that she had later retracted her statement, and that F.R. was serving a lengthy prison sentence in the custody of the Alabama Department of Corrections.

Counsel for A.S. filed a notice with the trial court after the termination trial in which she, in addition to detailing her efforts to locate A.S., noted that she had spoken with J.B. and that J.B. had stated that he was not the father of the youngest child.

No issue is raised on appeal regarding the mother's consent or her revocation of consent.